COMMON CAUSE et al., Plaintiffs,

v.

William F. BOLGER et al., Defendants,

and

House Commission on Congressional Mailing Standards, Intervening Defendant,

and

United States Senate, Amicus Curiae.

Civ. No. 1887–73.

United States District Court, District of Columbia.

Dec. 11, 1980.

Donald J. Simon, Ellen G. Block, Kenneth J. Guido, Jr., Washington, D. C., for Common Cause and John W. Gardner.

Steven Frank, Bruce E. Titus, Joseph Devereux, Trial Attorney, Civil Division, U. S. Dept. of Justice, Washington, D. C., for Benjamin F. Bailer and William B. Simon.

Edwin M. Zimmerman, Lawrence J. Jensen, Roger D. Kaplan, Dept. of Justice, Washington, D. C., for House Com'n on Congressional Mailing Standards.

Michael Davidson, Senate Legal Counsel, Washington, D. C., for the U. S. Senate, amicus curiae.

Before WILKEY, Circuit Judge, and PRATT and HART, District Judges.

MEMORANDUM OPINION.

PRATT, District Judge.

This action challenges the constitutionality of certain portions of the congressional franking statute, 39 U.S.C. § 3210 (1976 ed.). Plaintiffs, whose members include more than fifty candidates challenging incumbent members of Congress for election, contend that the statute is unconstitutional on its face and violates their First and Fifth Amendment rights by subsidizing the election of incumbent congressmen but not of challengers. The defendants, the intervenor and the *amicus curiae* have moved to dismiss contending that plaintiffs lack standing, that the action is unripe and moot, and that this court should dismiss the case on prudential grounds. This is the third such motion to dismiss that defendants have made since this case was first filed in 1973. For the reasons stated below, the motion to dismiss is denied.

I. *Standing*

Secretary of the Treasury Miller and Postmaster General Bolger, the defendants, the House Commission on Congressional Mailing Standards, the intervenor, and the United States Senate, *amicus curiae*, all contend that Common Cause and John Gardner lack standing to bring this action. If these assertions are correct, and if the plaintiffs are not proper parties to press this claim, the action must be dismissed for lack of jurisdiction under the case or controversy requirement of Article III of the Constitution.

This court has twice denied a motion to dismiss for lack of standing, once by order of June 26, 1974, and once by opinion on February 10, 1975. Earlier rulings of this sort are "law of the case," and on non-jurisdictional issues are normally conclusive. *E. g., Insurance Group Committee v. Denver & R.G.W.R. Co.*, 329 U.S. 607, 612, 67 S.Ct. 583, 585, 91 L.Ed. 547 (1947); *Petition of*

*United States Steel Corporation*, 479 F.2d 489, 494 (6th Cir. 1974), *cert. denied*, 414 U.S. 859, 94 S.Ct. 71, 38 L.Ed.2d 110 (1973).

Where a jurisdictional challenge is repeated, however, as is the case where standing is in issue, the "law of the case" requirement is less rigid. Earlier jurisdictional rulings are entitled to important, but not dispositive weight. 1B *Moore's Federal Practice* ¶ 0.404, p. 452 (1980 ed.). If it can be shown that controlling authority has subsequently taken a clearly contrary view of the issue, then the renewed motion to dismiss for lack of jurisdiction may be appropriately filed and may prevail. *See Crane Co. v. American Standard, Inc.*, 603 F.2d 244, 248–49 (2d Cir. 1979); *Morrow v. Dillard*, 580 F.2d 1284, 1294 (5th Cir. 1978).

In this factual context, the burden is thus on the proponents of this motion to show that more recent decisions by the Supreme Court and the United States Court of Appeals for the District of Columbia Circuit compel this court to reverse its prior position and dismiss the complaint for want of standing.

It is the position of all defendants that parties in plaintiffs' position must now make more specific and substantial threshold showings as to injury, causation, and redressability as the result of recent decisions.

Specifically, defendants contend that the Supreme Court's decision in *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975), and the D. C. Circuit's 133 (D.C.Cir. 1980), *cert. denied*, 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980), significantly change the law of standing, thereby requiring this court to reverse its two previous rulings. In these two cases, the courts dismissed complaints for lack of standing because plaintiffs failed to allege a "distinct and palpable injury" to themselves, *Winpisinger v. Watson, supra*, at 137; *Warth v. Seldin, supra*, 422 U.S. at 501, 95 S.Ct. at 2206, an injury "that can fairly be traced to the challenged action of the defendant, and not injury that results from independent action

of some third party not before the Court." *Winpisinger v. Watson, supra,* at 137, citing *Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976). In both *Winpisinger* and *Warth, supra,* plaintiffs failed to meet their burden of demonstrating the causality prerequisite to standing.

According to this argument, plaintiffs' asserted interests are those in the election of certain candidates, and the election or defeat of particular candidates depends on too many other factors besides the operation of the franking statute to satisfy the causation requirements laid down in these cases. In other words, it cannot be said that an order by the court granting plaintiffs the relief they seek would remedy the harm they allege. To the extent that plaintiffs assert an interest in a fair and equal electoral process, defendants assert that such an interest is too remote, speculative, and abstract to confer standing on these plaintiffs to press this claim. Their process claim, according to this argument, is indistinguishable from a generalized grievance of the citizenry about the operation of the political system.

Plaintiffs respond by contending that regardless of electoral outcomes, the interest in a fair electoral process that they assert is directly affected by the defendants' actions under the franking statute. Moreover, plaintiffs allege that they suffer particularized harms distinct from those suffered by the citizenry at large. Under this characterization of the complaint, the causation requirements of the *Warth* and *Winpisinger* cases are not in issue, because the asserted harm *is* the franking statute and defendants' action thereunder. There is no third party action here complicating the issue. Plaintiffs are *directly* harmed by defendants' actions.

We now turn to the complaint and examine it in detail in order to decide which is the proper characterization. Moreover, in ruling on this motion to dismiss, the court must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party. *Warth v. Seldin, supra; Jenkins v. McKeithen,* 395 U.S. 411, 421–422, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969).

Plaintiff Common Cause sues on behalf of its members who are:[1]

1. Congressional candidates;
2. Contributors of lawful amounts of money to candidates for federal elective office and to political committees and organizations which support such candidates;
3. Campaign participants;
4. Registered voters for candidates for federal elective office;
5. "Regular and substantial users of the mails as a means of participation in the foregoing activities;" and
6. Taxpayers.

In addition to the interests asserted on behalf of its members, Common Cause asserts its own interest as a "frequent and heavy" user of the mails, having spent $904,313.50 on postage during 1973.[2] Plaintiff John Gardner alleges that he is a taxpaying citizen, residing in Maryland, who is a registered voter, and a contributor of lawful amounts of money to candidates for Congress, and a regular user of the mails for these purposes.[3]

In order for an organization such as Common Cause to bring suit on behalf of its members, it "must allege that its members, *or any one of them,* are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable claim had the members themselves brought suit." *Warth v. Seldin, supra,* 422 U.S. at 511, 95 S.Ct. at 2211; *Sierra Club v. Morton,* 405 U.S. 727, 734–41, 92 S.Ct. 1361, 1365–1366, 31 L.Ed.2d

---

1. Plaintiffs' Complaint, ¶ 4.

2. *Id.*

3. *Id.,* at ¶ 5.

636 (1972) (emphasis added). *Accord, Committee for Full Employment v. Blumenthal,* 606 F.2d 1062, 1067 (D.C.Cir.1979); *Animal Welfare Institute v. Kreps,* 561 F.2d 1002, 1008 (D.C.Cir.1977), *cert. denied,* 434 U.S. 1013, 98 S.Ct. 726, 54 L.Ed.2d 756 (1977). Moreover, standing in this situation

> depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured.

*Warth v. Seldin, supra,* 422 U.S. at 515, 95 S.Ct. at 2213.

Thus Common Cause must meet two tests in order to assert its members' claims. First, it must seek prospective relief, as it does in this case. Its prayer for relief asks for declaratory judgment and an injunction.[4]

Second, the members themselves must have standing to assert the claims that the organization seeks to assert on their behalf. Common Cause thus stands in the shoes of its members in determining whether there is standing.

A. *As Candidates for Elective Office*

Common Cause alleges that its members include persons who have been and plan to be candidates for federal elective office.[5] More than fifty such members challenged incumbent congressmen in the 1974 election,[6] and, for the purposes of ruling on this motion to dismiss, it is safe to assume that Common Cause has members who ran against incumbents in later elections, and who will do so in the future.

Do these candidates, and thus Common Cause, have standing to challenge the franking statute? We believe that they do. Defendants' and intervenor's reliance on

the causation requirements of *Warth v. Seldin, supra,* and *Winpisinger v. Watson, supra,* is misplaced because the injury involved here occurs regardless of the outcome of any particular election. According to plaintiffs' complaint, this injury consists in granting incumbents what amounts to a subsidy worth more than $50,000 to each incumbent.[7]

This injury is personal to the candidates, substantial in effect, and directly traceable to the operation of the franking statute. In order to neutralize this advantage of incumbency, a challenger must raise substantially greater funds than he otherwise would, or, if he is able, contribute such moneys to his campaign out of his own pocket.[8] The injury is substantial. The dollar value of the "contribution" is more than fifty times the maximum amount an individual can contribute to a congressional campaign, 2 U.S.C. § 441a(a)(1) (Supp. III 1979), and in most cases, more than five times the amount that a political party's central committee can contribute. 2 U.S.C. § 441a(d)(3) (Supp. III 1979). The injury is not only directly traceable to the operation of the franking statute, but as plaintiffs have framed this action, the statute itself *is* the injury because of its alleged facial invalidity.

The Supreme Court's decision in *Buckley v. Valeo,* 424 U.S. 1, 11–12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976), supports candidate standing to challenge the constitutionality of the franking statute. In *Buckley,* the court found that plaintiffs, including Senator Buckley, had alleged a sufficient personal stake in the outcome of the proceeding—whether certain campaign expenditure and contribution limitations were constitutional—to satisfy Article III's case or controversy requirement. *Id.* Moreover, the court noted that an association could assert the personal interests of its members in

---

4. *Id.,* at ¶¶ 28–34.

5. Plaintiffs complaint, ¶ 4.

6. Memorandum Opinion of Feb. 10, 1975, at pp. 3–4.

7. Plaintiffs' complaint, ¶ 20.

8. Individual candidates may contribute as much as they wish to their campaigns. *Buckley v. Valeo,* 424 U.S. 1, 51–55, 96 S.Ct. 612, 650–652, 46 L.Ed.2d 659 (1976).

such a case. *See id.* at 12, n. 10, 96 S.Ct. at 631, n. 10. Candidate standing to challenge the franking statute is further supported by *Schiaffo v. Helstoski*, 492 F.2d 413 (3d Cir. 1974), and by *Hoellen v. Annunzio*, 468 F.2d 522 (7th Cir. 1972), *cert. denied*, 412 U.S. 953, 93 S.Ct. 3001, 37 L.Ed.2d 1006 (1973). These decisions held that congressional candidates had standing to challenge the incumbent's use of the frank in election campaigns.

### B. *As Contributors and Campaign Participants*

■ The analysis of contributor and campaign worker standing is similar. Contributors of "lawful amounts" of money to candidates for federal elective office,[9] and "active participants" in these campaigns suffer injury regardless of the outcome of the election. The purpose of political campaigns is often as much to educate the public concerning certain issues as it is to elect a candidate who holds particular positions on these issues. The effectiveness of these contributions and campaign work will be substantially undercut by the funding subsidy of each incumbent. Plaintiffs do not claim that their injuries result from the outcome of elections but rather the fact that the political process is tainted and rendered unfair by the political use of the frank which the statute permits. Thus the causation requirements of *Warth* and *Winpisinger* are satisfied, because the franking statute itself and the conduct permitted thereunder inflicts these harms regardless of the outcome of elections.

### C. *As Users of the Mails as a Means of Participating in the Political Process*

■ Common Cause also alleges that its members include people who are regular and substantial users of the mail for the purposes of making contributions and assisting in the electoral process.[10] In addition, Common Cause alleges that it spent more than $900,000 on mailing costs in 1973,

largely for the purposes of promoting the objectives of the organization: making government more responsive through reform of the political process.[11] The injury to Common Cause and its members consists in the grant of what they allege is an illegal mail subsidy to competitors, a form of injury that has traditionally sufficed to confer standing. The illegal grant of a franchise to a competitor, or the illegal entry of a government-regulated competitor into plaintiff's line of business suffice to confer standing. *See Association of Data Processors v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Hardin v. Kentucky Utility Co.*, 390 U.S. 1, 5–7, 88 S.Ct. 651, 654, 19 L.Ed.2d 787 (1968). Likewise, the illegal classification of a competitor's mail is often a basis for intervention in proceedings before the Postal Service, *see* 39 C.F.R. § 954.10 (1979), just as the Postal Service's failure to follow notice and comment procedures in making nationally applicable changes in organization gives rise to *citizen* standing to challenge the action. *Buchanan v. United States Postal Service*, 375 F.Supp. 1014, 1017–20 (N.D.Ala.1974), *aff'd in part, vacated in part on other grounds*, 508 F.2d 259 (5th Cir. 1975).

■ It would be strange to permit commercial mail users standing to challenge the classification of a competitor's mail, and to permit citizens standing to challenge nationally applicable changes in the organization of the Postal Service, but to deny standing to substantial users of the mail for political campaign purposes who seek to challenge the use of *free* mailing privileges by opponents. The amount of money at stake in the subsidized political mailings involved here may far exceed that involved in the commercial context; the complaint alleges that the frank is a campaign subsidy worth more than $50,000 per congressman per election year,[12] and alleges further that

---

9. Plaintiffs' complaint, ¶¶ 4, 5.

10. Plaintiffs' complaint, ¶ 4.

11. *Id.*

12. *Id.*, at ¶ 20.

the cost of franked mail exceeds 35 million dollars annually.[13]

### D. As Registered Voters

■ The complaint further alleges that Common Cause's members include "registered voters for candidates for federal elective office," including challengers discriminated against by incumbents' illegal use of the frank. These voters have alleged actual injury to themselves apart from electoral outcome, namely, that the franking statute places an unconstitutional burden on the congressional candidates of their choice, and thus on their right to associate freely for political purposes. The franking statute itself, they allege, burdens their political rights and discriminates against them. It is clear that, if the statute does hinder or deny the exercise of these rights, that an appropriate decree by this court would redress the injury, thus satisfying the causation or redressability test of *Warth v. Seldin, supra,* and *Winpisinger v. Watson, supra.*

### E. As Taxpayers

■ Finally, Common Cause alleges that its membership includes federal taxpayers whose taxable income is more than six billion dollars a year, and whose federal income tax liability is more than one billion dollars a year.[14] John Gardner alleges that he is a taxpaying citizen as well as a voter, contributor to candidates and political committees and frequent user of the mails as a concomitant of the foregoing activities. Plaintiffs contend that expenditures of federal funds under the franking statute "violate the limitations upon the taxing and spending power of Congress under Article I, Section 8, and contravene the First and Fifth Amendments of the Constitution."[15] As this court recognized in its February 10, 1975 opinion, pp. 2–4, these allegations met the requirements laid down for taxpayer standing in *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), and

*Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2962, 41 L.Ed.2d 706 (1974): first, allegations of injury in fact distinct from that suffered by the general populus, and second, allegations of a nexus between the injuries suffered and the constitutional infringements alleged. Defendants contend, in effect, that even if these requirements of *Flast* and related cases on taxpayer standing are met, that the causation requirements of *Warth v. Seldin, supra,* are not satisfied because the injuries complained of are not fairly traceable to the operation of the franking statute. We have rejected this argument in the contexts discussed above, and now reject it here. We are aware that a single taxpayer has frequently been held to lack standing. This is not such a case.

This dispute over standing boils down to a dispute over the role of congressional elections in our political system. If the purpose of campaigns is only to elect candidates, then defendants' and intervenor's arguments concerning causation and resultant lack of standing might have some weight. Congressional campaigns, however, serve other purposes besides electing particular candidates to office. They are also used to educate the public, to advance unpopular ideas, and to protest the political order, even if the particular candidate has little hope of election. The First Amendment most certainly protects political advocacy of this type, and infringements of these rights can occur regardless of the success or failure of a particular candidate at the polls. Thus, the causation requirement is satisfied here, for the asserted harm, and its remedy, are not dependent upon electoral outcome, but on the existence of the franking statute and the conduct permitted under its aegis.

### II. Prudential Considerations

■ Prudential considerations, it is argued, require this court to dismiss plaintiff's complaint, regardless of standing. According to this argument, grant of the injunctive relief sought by the plaintiffs

---

**13.** *Id.,* at ¶ 18.

**14.** Opinion of Feb. 10, 1975, at 3.

**15.** *Id.*

would require this court to decide an issue for which there are no judicially manageable standards, namely, what constitutes the official business of a Member of Congress for the purpose of the franking privilege. As there are no such standards for decision of this issue, it follows that there are none for the framing of the requested injunctive relief. The only way to implement the proposed injunction would be for this court to order "an army of Executive Branch censors" to read every piece of franked mail.[16] This relief would lock this court, Congress, and the Executive Branch in a continuing confrontation over the implementation of the injunction, and over what constitutes official business as opposed to electioneering. It was this type of problem which caused the court in *Winpisinger, supra,* to decide as it did, in addition to the matter of lack of standing.

We cannot accept this argument, which in effect is the counsel of despair. Plaintiffs' complaint squarely presents several legal issues for decision, regardless of the content of the mailed matter. The complaint alleges four separate causes of action. Three of the four causes of action deal exclusively with mass mailings of newsletters and news releases [17] independent of their messages, and include those prepared and printed with campaign contributions. The challenged statute explicitly authorizes these mailings. 39 U.S.C. §§ 3210(e), 3210(a)(3)(B), 3210(a)(3)(F), 3210(a)(5)(D), and 3210(d) (1976 ed.). Plaintiffs allege that these mass-mailed newsletters and news releases violate their First and Fifth Amendment rights, and the taxing and spending clause of the Constitution, Art. I, § 8.[18] In addition, plaintiffs allege that by continuing to honor and pay for franked mass mailings, defendants Bolger and Miller violate plaintiffs' constitutional rights, abuse their discretion within the meaning of 5 U.S.C. § 706 (1976 ed.) and unlawfully interpret their statutory duties under 39

U.S.C. §§ 101 and 403 (1976 ed.), and under 31 U.S.C. § 1002 (1976 ed.).[19]

Plaintiffs' other cause of action is also an attack on the facial validity of certain provisions of the franking statute. Besides challenging the authorization for mass mailings within a month of an election or outside a Member's district, this cause of action attacks the use of the frank for mail matter not exclusively related to the performance of official functions including unsolicited mailings of biographical material, campaign literature, condolences and congratulations, self-laudatory material, and reports on the outside activities of a Member and his family.[20] Again, these challenges also involve mass mailings regardless of content, or the statutory authorizations for certain easily recognized categories of franked mail.

■ Defendants assert that there are no judicially manageable standards for the decision of this case. Lack of such standards has traditionally meant not that the court is presented with a difficult legal question, but that in providing relief, the court would be required to intrude on the exercise of substantial discretion by a coordinate branch of government, discretion conferred by the Constitution and intended to be exclusive, or nearly so. *See, e. g., Baker v. Carr,* 369 U.S. 186, 210–217, 82 S.Ct. 691, 706–710, 7 L.Ed.2d 663 (1962). Even in cases involving foreign affairs issues, where prudential considerations traditionally have played their most important role, the invocation of prudential barriers by one of the litigants does not automatically bar the courts from deciding such a case. *See id.,* at 211–13, 82 S.Ct. at 706–707. Instead the courts carefully examine claims to see if they are in a form fit for judicial resolution. Thus in *Winpisinger, supra,* so heavily relied upon by defendants and intervenor, the Court of Appeals found that prudential considerations strongly counseled against as-

---

16. Defendants' Memorandum in Opposition, at 3.

17. Plaintiffs' Complaint, ¶¶ 22, 24, 25.

18. *Id.,* ¶ 22.

19. *Id.,* ¶¶ 24, 25.

20. *Id.,* ¶ 23.

suming jurisdiction, since the allegations in the complaint related "quite literally, to virtually every discretionary decision made by the Administration acting through high government officials." *Id.* at 139; *see Public Citizen, Inc. v. Simon*, 539 F.2d 211, 217 (D.C.Cir.1976) (judiciary not to act as a management overseer of the Executive Branch).

Our examination of plaintiffs' complaint shows that this is not a case where prudential considerations should bar us from reaching the merits. This case does not involve major, discretionary policy decisions such as recognition of a foreign government. *See Goldwater v. Carter*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979). Neither does it involve a host of discretionary decisions by numerous political appointees of a particular administration. *See Winpisinger v. Watson, supra.* Instead, this case involves arguably discretionary decisions by Postmaster General Bolger and Secretary of the Treasury Miller to implement explicit statutory language requiring them to honor and pay for certain classes of franked mail, and further involves the routine, ministerial decisions by postal and treasury employees in carrying and paying for this mail. This is a dispute which is in a form fit for judicial resolution. The Constitution, caselaw, and the affected statutes provide adequate judicial standards for decision of these claims, just as they have in the context of other challenges involving Congress, elections, and constitutional rights. *See, e. g., Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976).

Defendants make a second argument for the invocation of prudential barriers: granting the requested relief would trigger a confrontation between this court, Congress and the Executive Branch. This confrontation would occur, it is argued, because the only way to implement the injunction sought by plaintiffs would be to have the Executive Branch censor each piece of franked mail in order to decide what letters concerned official business and what mail was for electioneering purposes. This court would be faced with continual appeals from those decisions to send or hold franked mail, appeals brought both by disgruntled congressmen and by Common Cause.

This argument is related to the argument over the existence of judicially manageable standards to decide this case, and like that argument, fails. There are standards both to decide this case and fashion an appropriate remedy. Our examination of the complaint, *supra*, shows that three of the four causes of action deal solely with the *per se* legality of certain types of mass mailings irrespective of content.[21] Moreover, part of the fourth cause of action also involves the timing and destination of certain mass mailings.[22] Injunctive relief would not require examination of the mail's content. Instead, postal and congressional employees could comply using little more than a calendar, a postal map of their district, and simple arithmetic.

Defendants and intervenor have focused on the part of the fourth cause of action concerning the content and origin of certain types of franked mail, and on plaintiffs' prayer for injunctive relief ordering the inspection of franked mail.[23] Assuming arguendo that such inspection is ordered, this court may limit such inspections to avoid the problems of censorship argued by defendants and intervenor. The Postal Service could, for instance, be ordered to restrict pre-mailing inspections to the number, timing, and destination of mass mailings, and to delve into content matters only when such issues are raised by campaign opponents, citizens, or the press. Most or all of the horrors conjured up by defendants could be avoided by carefully tailoring any injunction.

Examination of the full relief sought by plaintiffs shows that the potential interbranch controversies imagined in the motion to dismiss are illusory. Plaintiffs seek

---

**21.** *Id.,* at ¶¶ 22, 24, 25.

**22.** *Id.,* at ¶ 23.

**23.** *Id.,* at ¶ 33.

a declaratory judgment that their rights have been violated by the statute and by defendants' actions in implementing it.[24] In addition, they seek an injunction against the operation of the statute, and an order to defendants to inspect franked mail and to refuse to honor and pay for it when used for mass mailings and other matters not in the line of official duty.[25]

If this court decides in favor of plaintiffs on the merits, entry of a declaratory judgment as to the statute's illegality will provide a clear standard for Members of Congress to follow in using the frank. We will not lightly assume, as defendants and intervenor seem to in their briefs, that high elected officials would deliberately violate such an order. Entry of such an order alone would probably go far toward securing compliance, and reduce inspection problems.

If this court should decide to enjoin the operation of the franking statute, there are a number of ways to minimize any problems created by such an order. To begin with, this court might stay its order while Congress enacted a new statute or while the decision was appealed to the Supreme Court. The court might also phase in such relief in order to give Members adequate time to familiarize themselves with the decision and its requirements.

To accept defendants' arguments that this court should not concern itself and provide a remedy responsive to the serious allegations of illegality pleaded by plaintiffs would be to admit our lack of judicial authority. This is not a case of *damnum absque injuria.*

We conclude that prudential considerations do not counsel us to refrain from decision of the issues presented by this case, or from entering such relief as may be appropriate.

III. *Ripeness and Mootness*

The Senate, as *amicus curiae*, raises two additional grounds for dismissal: lack of ripeness and the mootness of one of Common Cause's claims. These points need not detain us long, for these contentions are without merit, even making the dubious assumption that *amicus curiae* has standing to raise arguments not pressed by the parties. *See, e. g., Knetsch v. United States*, 364 U.S. 361, 370, 81 S.Ct. 132, 137, 5 L.Ed.2d 128 (1960); *Alexander v. Hall*, 64 F.R.D. 152, 155 (D.S.C.1974).

■ The Senate contends that this action is unripe because Common Cause did not first press its claims before the House and Senate committees dealing with the frank. The Senate further contends that this action is unripe since the court would have to render its decision on the basis of abstract and hypothetical facts, in essence an advisory opinion forbidden by the case or controversy requirement of Article III of the Constitution.

These arguments miss the point. The gravamen of plaintiffs' complaint is that an act of Congress is unconstitutional *on its face.* To support this claim, they have engaged in substantial discovery which has produced large volumes of material concerning Congressional mailing operations under the statute. Indeed, plaintiffs further discovery requests are being objected to as massive and burdensome.

More than five years ago, this court rejected an argument closely related to the one the Senate now advances: that plaintiffs should have been required to exhaust their remedies with the appropriate congressional committees before bringing this action. We ruled then and hold now that plaintiffs have no duty to bring their claims before these committees. These committees, as tribunals, have no power to grant the relief they seek, *i. e.*, a declaration of the invalidity of an Act of Congress. *See* Memorandum and Order of February 10, 1975, at 2. Where plaintiffs have no duty to exhaust, and where they assert that the existence and operation of the statute violates their First Amendment rights on a recurring basis, their claims are ripe for adjudication by this court.

**24.** *Id.*, at ¶¶ 28–31.

**25.** *Id.*, ¶¶ 32–33.

■ The Senate's second contention is that Common Cause's cause of action concerning the franking of campaign literature is moot, because the Senate has adopted a rule forbidding such use of the frank. This argument is utterly devoid of merit, for it is axiomatic that a Senate rule does not amend a statute, and that the Senate may change its rules anytime it chooses. Indeed, it has been asserted by statute that it is "the constitutional right of either House to change the rules ... at any time ...." 5 U.S.C. § 908(2) (Supp. III 1979). Even if we were to accept the Senate's argument that this claim was moot under the new rule, the Senate's rulemaking power would make this issue "capable of repetition yet evading review," thus warranting decision. *Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969); *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911).

For the foregoing reasons, the motions to dismiss this action are denied.

An order consistent with the foregoing has been entered this day.