963 F.2d 1394
 COLORADO TAXPAYERS UNION, INC.; Colorado Libertarian Party;
Mary Lind; David Aitkin; Vern Bickel; Pasquale
Francomano; Clyde Harkins; Basil R. Walton, Jr.,
Plaintiffs-Appellants/Cross-Appellees,
and
Janet Gustafson; Gene Levy, Plaintiffs,
v.
Roy ROMER, individually, and as Governor of the State of
Colorado, Defendant-Appellee/Cross-Appellant,
and
Citizens for Representative Government; Phil Fox; Clark
Shaw; Does 1 through 20, Defendants.
 Nos. 91-1005, 91-1019.
 United States Court of Appeals,
Tenth Circuit.
 May 15, 1992.
 
 Carla T. Main (Brian M. Cogan, of Stroock & Stroock & Lavan, New York City, Wayne E. Stockton, Fort Collins, Colo., and Michael McDonald, Center for Individual Rights, Washington, D.C., of counsel, with her on the briefs), of Stroock & Stroock & Lavan, New York City, for plaintiffs-appellants/cross-appellees.
 Maurice Knaizer, Office of Atty. Gen., (Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., and Timothy M. Tymkovich, Sol. Gen., on the briefs), for defendant-appellee/cross-appellant.
 Roxanne Campbell, Aurora, Colo., Alden Kautz, William Johnson, Roy Peister, Littleton, Colo.; Donald Turner, pro se amici, curiae.
 Before ANDERSON and TACHA, Circuit Judges, and COOK, District Judge.*
 TACHA, Circuit Judge.
 
 
 1
 Appellants appeal an order of the district court granting defendants' motion for summary judgment. Colorado Taxpayers Union, Inc. v. Romer, 750 F.Supp. 1041 (D.Colo.1990). On appeal, appellants contend that the Governor of Colorado violated their First Amendment rights by using state resources to defeat an amendment on the ballot at a Colorado general election. Appellee Romer cross appeals asserting that appellants lack standing to pursue this action. We exercise jurisdiction under 28 U.S.C. § 1291 and dismiss the appeal for lack of standing.
 
 BACKGROUND
 
 2
 In October of 1988, the citizens of Colorado placed an initiative, commonly referred to as Amendment six, on the ballot at the Colorado general election. Amendment six focused on statewide tax reform and would have allowed the citizens of Colorado to vote directly on any significant change in state tax laws.
 
 
 3
 Appellee Romer, the Governor of the State of Colorado, and defendant Citizens for Representative Government, of which defendants Phil Fox and Clark Shaw were members, publicly opposed the amendment. Appellants assert that Governor Romer used numerous public resources to publicly oppose the amendment. These resources allegedly included staff time, equipment and supplies, travel resources, and facilities at the state mansion and state capital office. Amendment six eventually was defeated in the Colorado general election.
 
 
 4
 After the defeat of the amendment, appellants filed a suit in the United States District Court for the District of Colorado seeking relief under 42 U.S.C. § 1983. Appellants claimed that Governor Romer violated their First Amendment rights by using state resources and the power and prestige of his office to oppose the amendment. Appellants also asserted that the Governor and the other defendants combined in a conspiracy to violate the appellants' constitutional rights in violation of 42 U.S.C. § 1985(3) and common law.
 
 
 5
 Asserting that appellants lacked standing and that they failed to state a claim for relief for a violation of the United States Constitution, defendants moved for summary judgment. Appellants cross-moved for summary judgment. The district court denied appellants' motion and then addressed defendants' motion, denying it in part and granting it in part. The district court found that appellants had standing to sue, but that Governor Romer's expenditures were "de minimis" so that the appellants failed to state a claim.
 
 DISCUSSION
 
 6
 On appeal, Romer contends that appellants lack standing to pursue this action. Because we agree with this contention, we address only the standing argument and do not address the merits of appellants' contentions on appeal. In this case, appellants are two associations, the Colorado Taxpayers Union and the Colorado Libertarian Party, and a number of individuals.
 
 
 7
 Before a party may invoke the jurisdiction of the federal courts, Article III requires that the party demonstrate that (1) " 'he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' "; (2) "the injury 'fairly can be traced to the challenged action' "; and (3) the injury " 'is likely to be redressed by a favorable decision.' " Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (quoting Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) and Simon v. Eastern Ky. Welfare Rights Org., 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). If a party satisfies these minimum constitutional requirements, then a court may still deny standing for prudential reasons if the injury alleged constitutes a "generalized grievance" that more appropriately should be addressed by the representative branches. See Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).
 
 
 8
 The district court concluded that plaintiffs "alleged sufficient injury for standing." Colorado Taxpayers Union, Inc. v. Romer, 750 F.Supp. 1041, 1043 (D.Colo.1990). In support of this conclusion, the district court stated that "[t]he harm consists of the additional burden imposed on the plaintiffs by the defendants' allegedly unconstitutional acts. Like the plaintiffs in Common Cause v. Bolger, [512 F.Supp. 26, 30 (D.D.C.1980) ], the plaintiffs here have alleged that their campaign for Amendment 6 would not have been so difficult (and, in fact, might have been successful) but for the defendants' acts." Id. We must now determine whether the individuals or either of the associations, the Colorado Libertarian Party or the Colorado Taxpayers Union, have standing to bring this suit.
 
 A. The Colorado Libertarian Party
 
 9
 Appellants contend that the Libertarian Party has standing to sue because it seeks judicial relief for injuries to the organization. An organization has standing on its own behalf if it meets the standing requirements that apply to individuals. Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79, 102 S.Ct. 1114, 1124-25, 71 L.Ed.2d 214 (1982). To have standing, plaintiffs must allege " 'such a personal stake in the outcome of the controversy' as to warrant ... invocation of federal-court jurisdiction." Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 261, 97 S.Ct. 555, 561, 50 L.Ed.2d 450 (1977) (quoting Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962)). Appellants must demonstrate that their alleged injury is an "injury in fact, economic or otherwise." Association of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). The injury must be " 'distinct and palpable,' " Gladstone, Realtors v. Village of Bellwood, 441 U.S. 91, 100, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979) (quoting Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)), and "real and immediate," not abstract, conjectural, speculative, or hypothetical, City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 1664-65, 75 L.Ed.2d 675 (1983).
 
 
 10
 Appellants claim that Governor Romer used his staff and the resources of his office to defeat the tax initiative supported by the Libertarian Party and thus forced the Party to bear a greater burden in its attempt to pass the amendment. Appellants claim that under Havens, 455 U.S. at 379, 102 S.Ct. at 1124, this drain on resources is a concrete and demonstrable injury.
 
 
 11
 In Havens, the Supreme Court found that an organization was entitled to standing on its own behalf because the organization alleged that an apartment owner's racial steering practices had perceptively impaired the organization's ability to provide counseling and referral services for low and moderate income home seekers. The Court stated that "[s]uch [a] concrete and demonstrable injury to the organization's activities--with the consequent drain on the organization's resources--constitutes far more than simply a setback to the organization's abstract social interests." Id. at 379, 102 S.Ct. at 1124.
 
 
 12
 Appellants' argument that they were forced to counteract the Governor's activities through the expenditure of additional funds is purely conjectural. Such an argument simply does not demonstrate that the Libertarian Party or its members have suffered a distinct and concrete injury. At most, the Libertarian Party's allegations suggest only that the organization has received a minor setback to its organizational purpose. The Libertarian Party's argument would require this court to engage in a futile act of speculation in order to determine the extent of some remote, uncertain injury. This type of conjectural injury cannot establish standing under Havens. In Havens, the defendant's allegedly unlawful conduct could be tied directly to a concrete harm inflicted upon the primary activity of the plaintiff organization--the organization's counseling and referral efforts were rendered futile when the defendant turned away referred applicants. Here, appellants' actions in spending additional funds simply cannot be traced to the Governor's allegedly illegal expenditures. It is pure conjecture to assume that Governor Romer's activities caused appellants to drain their resources. Thus, we conclude that appellants have not "allege[d] [a] personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).
 
 
 13
 The Libertarian Party also argues that it suffered an injury when its First Amendment rights were chilled. Appellants contend that the allegedly illegal expenditures by the Governor effectively imposed a tax upon the Libertarian Party in its effort to exercise its First Amendment right to petition. Essentially, appellants claim that the dilution of Party resources chilled the exercise of First Amendment rights.
 
 
 14
 We cannot agree with the characterization of the Governor's activities as a "tax" on the Libertarian Party or its members' First Amendment right to petition. The Governor's activities in no way prevented the Libertarian Party or its members from petitioning the government. The Governor's activities only commenced once the amendment was placed on the ballot. The Governor's allegedly unlawful activities never prevented members of the Libertarian Party from associating, speaking on behalf of the amendment, or voting on the amendment. Further, the Libertarian Party and its members failed to demonstrate that Romer's activities impacted their ability to petition the government of Colorado in the future. Thus, neither the Libertarian Party nor its members has demonstrated that First Amendment rights were chilled.
 
 
 15
 The Libertarian Party contends that even if it has not been injured, it is entitled to standing on behalf of its members. In Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), the Supreme Court announced a three-part test for associational standing:
 
 
 16
 [A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit.
 
 
 17
 Because we conclude that the Libertarian Party's members do not have standing to sue in their own right, the Party is not entitled to associational standing.
 
 
 18
 B. The Colorado Taxpayers Union and the Individual Appellants
 
 
 19
 The individual appellants claim that they are entitled to standing as taxpayers. The Colorado Taxpayers Union asserts standing as an organization suing on behalf of its tax-paying members. Appellants argue that the Governor illegally used state tax funds in order to defeat Amendment six and that this misappropriation entitles them to standing under Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The district court stated that "[t]he essence of the plaintiffs' position is that when the Governor becomes an advocate against a citizen initiative, he has exceeded the limits of his official power and interfered in the process by which the people exercise their sovereign right to change the authority of the officials who govern them." Colorado Taxpayers Union, Inc., 750 F.Supp. at 1044. Appellee Romer argues that this claim is insufficient to give appellants taxpayer standing under Flast.
 
 
 20
 Most of the taxpayer standing cases addressed by the Supreme Court deal with federal taxpayer standing. The general prohibition against federal taxpayer standing originated in Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923). In Frothingham, the Supreme Court held that a federal taxpayer lacks standing to sue to enjoin federal officials from enforcing a federal statute authorizing appropriations of public money. The federal taxpayer attacked the Maternity Act of 1921, which established a federal program of grants to states to reduce maternal and infant mortality. The taxpayer alleged that Congress, in enacting the Act, exceeded its powers under Article I of the Constitution. She argued that "the effect of the appropriations complained of will be to increase the burden of future taxation and thereby take her property without due process of law." Id. at 486, 43 S.Ct. at 600.
 
 
 21
 The Court began its analysis by noting that "[t]he interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse in not inappropriate. It is upheld by a large number of state cases and is the rule of this court." Id. The Court then distinguished federal taxpayers from municipal taxpayers and stated that a federal taxpayer's "interest in the moneys of the treasury ... is comparatively minute and indeterminable" and that "the effect upon future taxation, of any payment out of the [Treasury's] funds, [is] remote, fluctuating and uncertain." Id. at 487, 43 S.Ct. at 601. Thus, the Court found that the federal taxpayer lacked standing.
 
 
 22
 In Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Court created an exception to the bar on federal taxpayer standing in the context of Establishment Clause challenges. The Court asked "whether the Frothingham barrier should be lowered when a taxpayer attacks a federal statute on the ground that it violates the Establishment and Free Exercise Clauses of the First Amendment." Id. at 85, 88 S.Ct. at 1944. To resolve this issue, the Court noted that a court must "determine whether there is a logical nexus between the status asserted and the claim sought to be adjudicated." Id. at 102, 88 S.Ct. at 1953. The Court then concluded that the nexus requirement for a federal taxpayer contains two aspects. "First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked." Id. Under this first aspect, a taxpayer can only challenge the unconstitutionality of exercises of congressional power under the Taxing and Spending Clause of Article I, Section 8 of the Constitution. The second aspect requires that a taxpayer establish "a nexus between that status and the precise nature of the constitutional infringement alleged." Id. To satisfy this requirement, a taxpayer must show that the challenged action "exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power." Id. at 10203, 88 S.Ct. at 1953-54. In Flast, the taxpayers satisfied both aspects of the required nexus because they challenged a congressional exercise of power under Article I, Section 8 and because they asserted that the congressional expenditures violated the First Amendment's Establishment Clause, which specifically limits the taxing and spending power of Article I, Section 8.
 
 
 23
 After Flast, the Court consistently has adhered to the "narrow exception [Flast ] created to the general rule against taxpayer standing." Bowen v. Kendrick, 487 U.S. 589, 618, 108 S.Ct. 2562, 2579, 101 L.Ed.2d 520 (1988). In Valley Forge Christian College v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), the Court held that federal taxpayers lacked standing to challenge the Secretary of Health, Education, and Welfare's (HEW) decision to give property to a religious institution. The Court rejected the taxpayers' standing argument because the "source of their complaint is not a congressional action, but a decision by HEW to transfer a parcel of federal property." Id. at 479, 102 S.Ct. at 762. The Court also reasoned that "the property transfer about which [the taxpayers] complain was not an exercise of authority conferred by the Taxing and Spending Clause." Id. at 480, 102 S.Ct. at 762.[1] Thus, the Court has indicated that Flast applies only to cases in which a federal taxpayer challenges a congressional appropriation made pursuant to Article I, Section 8 that allegedly violates the Establishment Clause of the First Amendment. See United States v. Richardson, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); Schlesinger v. Reservists Comm. to Stop the War, 418 U.S. 208, 228, 94 S.Ct. 2925, 2935, 41 L.Ed.2d 706 (1974); Flast, 392 U.S. at 114, 115, 88 S.Ct. at 1959, 1960 (Stewart, J., concurring and Fortas, J., concurring); see also Taub v. Kentucky, 842 F.2d 912, 916 (6th Cir.), cert. denied, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988).
 
 
 24
 Both parties mistakenly rely on Flast to resolve whether appellants qualify for taxpayer standing in this case. Flast does not directly govern this appeal because it applies to federal taxpayer standing issues, not questions relating to standing for state taxpayers. Although neither Frothingham nor Flast analyzes questions of state taxpayer standing invoked to challenge state taxes or expenditures, the Supreme Court briefly addressed the issue in Doremus v. Board of Education, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952).
 
 
 25
 In Doremus, New Jersey state taxpayers sued the State of New Jersey seeking a declaratory judgment that a state law authorizing public school teachers to read from the Bible violated the First Amendment. The Court concluded that the plaintiffs lacked standing because they did not allege any direct injury to themselves. The Court stated that
 
 
 26
 [t]here is no allegation that this activity is supported by any separate tax or paid for from any particular appropriation or that it adds any sum whatever to the cost of conducting the school. No information is given as to what kind of taxes are paid by appellants and there is no averment that the Bible reading increases any tax they do pay or that as taxpayers they are, will, or possibly can be out of pocket because of it.
 
 
 27
 Id. at 433, 72 S.Ct. at 397. The Court reiterated that a taxpayer " 'must be able to show, not only that the statute is invalid, but that he has sustained or is immediately in danger of sustaining some direct injury as a result of its enforcement, and not merely that he suffers in some indefinite way in common with people generally.' " Id. at 434, 72 S.Ct. at 397 (quoting Commonwealth of Mass. v. Mellon, 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923)). The Court held that "[t]he taxpayer's action can meet this test, but only when it is a good-faith pocketbook action." Id. Thus, we must determine whether appellants' action satisfies the "good-faith pocketbook" requirement.
 
 
 28
 After Doremus, the federal courts have addressed the issue of state taxpayer standing and the type of claim that satisfies the good-faith pocketbook requirement infrequently. In Hoohuli v. Ariyoshi, 741 F.2d 1169 (9th Cir.1984), the Ninth Circuit examined the issue of state taxpayer standing and concluded that the plaintiffs met the Doremus requirements. In Hoohuli, state taxpayers brought an action challenging a system established by the State of Hawaii that disbursed benefits to residents who had descended from aboriginal inhabitants of the islands. The taxpayers claimed that "their tax dollars were being spent on a program which disbursed benefits based on impermissible racial classifications." Id. at 1172.
 
 
 29
 After reviewing Frothingham and Doremus, the Ninth Circuit concluded that "[s]tate taxpayers could still maintain taxpayer suits if their pleadings were sufficient. They were sufficient if they set forth the relationship between taxpayer, tax dollars, and the allegedly illegal government activity." Id. at 1178 (citation omitted). To reach this conclusion, the Ninth Circuit reviewed Flast and its progeny and found that because the Supreme Court did not discuss Doremus in the second part of the Flast nexus test, it implicitly distinguished between standing requirements for federal and state taxpayers. Id. at 1179. Thus, the Ninth Circuit decided that state taxpayer standing remained unchanged after Flast and must be guided by Doremus in its original form. Id. at 1179-80.
 
 
 30
 Based on this analysis, the Ninth Circuit held that the plaintiffs had satisfied the "good-faith pocketbook action" of Doremus. Each of the plaintiffs set forth his or her status as a taxpayer. The taxpayers challenged the appropriation, transfer and spending of taxpayers' money from the general fund of the state treasury. Further, the taxpayers alleged that they "ha[d] been burdened with the necessity to provide more taxes to support" the program. Id. at 1180. The Ninth Circuit concluded that "[t]he pleadings set forth with specificity amounts of money appropriated and spent for allegedly unlawful purposes." Id. Thus, under the test announced by the Ninth Circuit, a taxpayer must satisfy three requirements: (1) taxpayer status; (2) the appropriation of monies from the state's general funds; and (3) the spending of those funds for allegedly unlawful purposes.[2] Under this standard, a taxpayer need not demonstrate that "her tax burden will be lightened by elimination of the questioned expenditure." Cammack v. Waihee, 932 F.2d 765 (9th Cir.1991), petition for cert. filed, 60 USLW 3406 (Nov. 12, 1991).[3]
 
 
 31
 The Eighth Circuit, in Minnesota Federation of Teachers v. Randall, 891 F.2d 1354 (8th Cir.1989), agreed with the Ninth Circuit's approach to state taxpayer standing. In Randall, the plaintiffs, a teachers' union and its president, brought an action challenging the constitutionality of the Minnesota Post-Secondary Enrollment Options Act. Pursuant to the Act, public high school students in their junior and senior years could take advanced courses at two- and four-year colleges, some of which were religiously affiliated. The plaintiffs alleged that the Act violated the Establishment Clause of the First Amendment. Protesting the disbursement of tax money to sectarian schools and arguing that reallocation of funds reduced money available for his salary, the president of the teachers' union asserted standing as a taxpayer.
 
 
 32
 The district court dismissed the suit for lack of standing because it believed that to achieve state taxpayer standing, the plaintiff would have to show an increase in his tax bill under Doremus. Id. at 1357. The Eighth Circuit disagreed, concluding that Doremus did not require a showing of an increased tax burden. The court reasoned that "only a taxpayer really suffers a distinct injury from the improper use of public money in violation of the establishment clause" and "that taxpayer standing was created to specifically permit the airing of establishment claims." Id. at 1358. The Eighth Circuit concluded, "we do not believe that state taxpayers are required to show an increase in their tax burdens to allege sufficient injury." Id.
 
 
 33
 The Sixth Circuit addressed the issue of state taxpayer standing in Taub v. Kentucky, 842 F.2d 912 (6th Cir.), cert. denied, 488 U.S. 870, 109 S.Ct. 179, 102 L.Ed.2d 148 (1988). In Taub, a state taxpayer brought an action against Kentucky, its governor, and other executive officers to prevent them from spending state tax revenues in connection with the construction of an automotive assembly plant. The plaintiff, who paid approximately $1,200 dollars in state property taxes, claimed that "the action of the Commonwealth and various officials of the executive branch amount[ed] to the taking of private property through taxation for other than a public purpose." Id. at 914. After reviewing the federal taxpayer standing cases, the court noted that few cases have addressed the standing of state taxpayers where the Establishment Clause is not an issue, whereas municipal taxpayer standing has been recognized in a variety of contexts. Id. at 917. The Sixth Circuit then noted that challenges to the Establishment Clause create a unique situation in state taxpayer standing cases. Relying on the Supreme Court's notation in School District of Grand Rapids v. Ball, 473 U.S. 373, 380 n. 5, 105 S.Ct. 3216, 3220 n. 5, 87 L.Ed.2d 267 (1985), that the Court has "adjudicated [numerous] Establishment Clause challenges by state taxpayers to programs for aiding nonpublic schools," the Sixth Circuit stated that "[t]his observation [by the Supreme Court] points up the distinctive treatment of standing when the Establishment Clause is involved, but does not indicate any rule with respect to other state taxpayer suits." Taub, 842 F.2d at 917.
 
 
 34
 After undertaking the preceding analysis and reviewing Doremus, the court
 
 
 35
 conclude[d] that the requirements for federal taxpayer standing announced in Frothingham control the issue of state taxpayer standing, at least in those cases where violation of the Establishment Clause is not alleged.... In order to have standing, a state taxpayer must allege direct and palpable injury with sufficient specificity to meet the "good-faith pocketbook" requirement of Doremus.
 
 
 36
 Id. at 918. The Sixth Circuit disagreed with the Ninth Circuit's conclusion in Hoohuli that a state taxpayer must only allege that appropriated funds were spent for unlawful purposes. Id. at 918-19. In addition to this requirement, the court required that "[a] state taxpayer ... tie such allegations of illegal appropriations and expenditures to a specific claim of some direct and palpable injury threatened or suffered." Id. at 919.
 
 
 37
 After considering the cases relating to both federal and state taxpayer standing, we conclude that, where an Establishment Clause violation is not asserted, a state taxpayer must allege that appropriated funds were spent for an allegedly unlawful purpose and that the illegal appropriations and expenditures are tied to a direct and palpable injury threatened or suffered. Only by meeting these requirements will a state taxpayer satisfy the "good-faith pocketbook" requirement of Doremus. A state taxpayer must demonstrate that she will be "out of pocket" because of the allegedly illegal appropriation. Doremus, 342 U.S. at 433, 72 S.Ct. at 396.
 
 
 38
 In reaching this conclusion, we are guided by the Supreme Court's decision in ASARCO, Inc. v. Kadish, 490 U.S. 605, 109 S.Ct. 2037, 104 L.Ed.2d 696 (1989). In ASARCO, numerous individual state taxpayers and the Arizona Education Association, representing approximately 20,000 public school teachers in the State of Arizona, brought a suit in Arizona state court seeking a declaration that a state statute governing mineral leases on state land was void. The plaintiffs challenged the state statute on grounds that it did not comply with the methods Congress required the State to follow before leasing or selling the lands granted by the United States in the New Mexico-Arizona Enabling Act of 1910, 36 Stat. 557. Because the state court interpreted federal law, the Court addressed whether the plaintiffs would have had standing had the action originally been brought in federal court.
 
 
 39
 The Court noted that the general bar on federal taxpayer suits announced in Frothingham does not necessarily apply to municipal taxpayers "if it has been shown that the 'peculiar relation of the corporate taxpayer to the [municipal] corporation' makes the taxpayer's interest in the application of municipal revenues 'direct and immediate.' " ASARCO, 109 S.Ct. at 2043 (quoting Frothingham, 262 U.S. at 486-87, 43 S.Ct. at 600-01) (alteration in original). The Court then noted that "we have likened state taxpayers to federal taxpayers, and thus we have refused to confer standing upon a state taxpayer absent a showing of 'direct injury,' pecuniary or otherwise." Id. (quoting Doremus, 342 U.S. at 434, 72 S.Ct. at 397). The Court concluded that the state taxpayers were not entitled to standing because "[t]he possibility that taxpayers will receive any direct pecuniary relief from this lawsuit is 'remote, fluctuating and uncertain,' as stated in Frothingham, supra, and consequently the claimed injury is not 'likely to be redressed by a favorable decision.' " Id. (quoting Valley Forge, 454 U.S. at 472, 102 S.Ct. at 758).[4]
 
 
 40
 After reviewing the reasoning in ASARCO, we conclude that we must reject the Ninth Circuit's formulation of state taxpayer standing because it equates state taxpayers with municipal taxpayers for standing purposes. See Cammack, 932 F.2d at 770 ("we conclude that municipal taxpayer standing ... mirrors our threshold for state taxpayer standing"). Supreme Court jurisprudence indicates that state taxpayers must be likened to federal taxpayers. Thus, in addition to demonstrating that money was appropriated and spent for an allegedly unlawful purpose, a state taxpayer must show that a distinct and palpable injury resulted from the allegedly illegal appropriation or expenditure. To show such an injury, a state taxpayer must allege that he has suffered a monetary loss due to the allegedly unlawful activity's effect on his tax liability.[5]
 
 
 41
 Requiring a distinct and palpable injury for state taxpayers comports with notions of federalism that are central to our system of government. In the federal taxpayer standing cases, the Supreme Court has restricted standing to prevent the judicial branch from intruding into the provinces of the executive and the legislative branches. We agree with the Sixth Circuit that
 
 
 42
 [t]his separation of powers concern has a counterpoint which should be considered when a state taxpayer seeks to have a federal court enjoin the appropriation and spending activities of a state government. Considerations of federalism should signal the same caution in these circumstances as concern for preservation of the proper separation of powers in an "all federal" action.
 
 
 43
 Taub, 842 F.2d at 919. As the dissent in Hoohuli stated,Doremus requires a state taxpayer plaintiff to demonstrate "a good-faith pocketbook action," which appears to parallel the core article III injury-in-fact requirement. But when state taxpayers attack state spending in federal court, another major consideration operates: the integrity of our government's federalist structure. Unnecessary or abstract decisions by federal courts in cases where there is no case or controversy could unduly constrict experimental state welfare legislation and undermine local self-determination.
 
 
 44
 Hoohuli, 741 F.2d at 1183 (Wallace, J., dissenting) (citations omitted). In this case we have an especially compelling federalism concern that dictates careful attention to the threshold case or controversy requirement of standing. This case involves a citizen initiative effort. The right to initiate legislation is a unique state-created right. The allegations in this case suggest that the elected chief executive officer of the state cannot take an active official role in the state-created initiative process. We can discern few areas so sacrosanct as protection of state self-determination. The mere allegation of federal constitutional violations cannot be allowed to clothe a state governmental decisionmaking process with the ill-fitting garments of federal court scrutiny. The "direct injury" requirement for standing that has flourished since Frothingham and Doremus and that defines the appropriate litigants in a state taxpayer case proves yet again the wisdom of the Framers of the Constitution when they tied federal court jurisdiction to the "case or controversy" requirement and its attendant standing, ripeness, and mootness doctrines. This case proves the continuing importance of judicial vigilance over these time-tested doctrines. Absent such vigilance, we would seriously undermine the constitutional commitment to federalism.
 
 
 45
 In this case, appellants allege that funds were appropriated and spent for an unlawful purpose; however, they do not allege a distinct and palpable injury that results from an increased tax liability. Instead, appellants merely allege that the Governor's allegedly illegal activities forced them to spend additional funds to offset his efforts. "[A] taxpayer alleges injury only by virtue of his liability for taxes." Valley Forge, 454 U.S. at 478, 102 S.Ct. at 762. Appellants have not alleged that they have suffered any injury whatsoever as a result of paying increased taxes to fund the Governor's activities. Because appellants have not alleged an injury related to tax liability, they have not shown that they have suffered a distinct and palpable injury as a result of the allegedly illegal appropriations or expenditures. Thus, the individual appellants do not satisfy the good-faith pocketbook requirement of Doremus and are not entitled to standing as state taxpayers. Likewise, the Colorado Taxpayers Union lacks associational standing because its members do not have standing as taxpayers to sue in their own right. Hunt, 432 U.S. at 343, 97 S.Ct. at 2441.
 
 
 46
 Accordingly, both the individuals and the two associations lack standing to challenge the alleged illegality of the Governor's activities. The appeal is DISMISSED.
 
 
 
 *
 The Honorable H. Dale Cook, Chief Judge, United States District Court for the Northern District of Oklahoma, sitting by designation
 
 
 [1]
 The Supreme Court has permitted federal taxpayer standing when plaintiffs challenge that the administration of congressional grants violates the Establishment Clause. See Roemer v. Board of Pub. Works, 426 U.S. 736, 744, 96 S.Ct. 2337, 2343, 49 L.Ed.2d 179 (1976); Hunt v. McNair, 413 U.S. 734, 735-36, 93 S.Ct. 2868, 2870-71, 37 L.Ed.2d 923 (1973); Tilton v. Richardson, 403 U.S. 672, 676, 91 S.Ct. 2091, 2094, 29 L.Ed.2d 790 (1971)
 
 
 [2]
 The dissent in Hoohuli argued that the taxpayers lacked standing because they did not demonstrate how the Hawaiian plan increases the taxes they pay. Id. at 1183 (Wallace, J., dissenting). The dissent noted that if the taxpayers had shown a sufficient good-faith pocketbook injury, an "especially acute" dual federalism issue would arise. Id
 
 
 [3]
 In Cammack v. Waihee, the Ninth Circuit found that the same standing requirements that apply to state taxpayers also apply to municipal taxpayers. "[W]e conclude that municipal taxpayer standing simply requires the 'injury' of an allegedly improper expenditure of municipal funds, and in this way mirrors our threshold for state taxpayer standing." Id. at 770
 
 
 [4]
 Justice Kennedy garnered only four votes for the portion of the opinion that deals with state taxpayer standing. See ASARCO, 109 S.Ct. at 2053 (Brennan, J., concurring). Because Justice Brennan believed that it was unnecessary to address the state taxpayer standing issue, he did not concur in this part of Justice Kennedy's decision. Justice O'Connor did not take part in the decision
 
 
 [5]
 In ASARCO, the Court explained why the plaintiff-taxpayers lacked standing:
 [The taxpayers] have simply asserted that the Arizona statute governing mineral leases has "deprived the school trust funds of millions of dollars thereby resulting in unnecessarily higher taxes." Complaint, p III. Even if the first part of that assertion were correct, however, it is pure speculation whether the lawsuit would result in any actual tax relief for [the taxpayers].
 
 
 [109]
 S.Ct. at 2043 (emphasis added)