95 F.3d 1335
 Cally KARDULES, Mayor, Village of New Albany, Ohio, et al., Plaintiffs,
Emery Bennett; David Mango, Plaintiffs-Appellants,
v.
CITY OF COLUMBUS; James P. Joyce, Director, Department of
Public Utilities; George J. Arnold, Director,
Development Department, Defendants-Appellees.
 No. 94-3704.
 United States Court of Appeals,
 Sixth Circuit.
Argued June 12, 1996.
Decided Sept. 20, 1996.
 
 John S. Marshall (briefed), Spater, Gittes, Schulte & Kolman, Columbus, OH, Louis A. Jacobs, Upper Arlington, OH, Neil E. Klingshirn (argued and briefed), Fortney & Klingshirn, Akron, OH, Brent Patterson, New Albany, OH, for Plaintiffs-Appellants.
 Ronald J. O'Brien (argued and briefed), City Attys. Office, Columbus, OH, for Defendants-Appellees.
 Before: KEITH and BATCHELDER, Circuit Judges; ROSEN, District Judge.*
 ROSEN, D.J., delivered the opinion of the court, in which KEITH, J., joined. BATCHELDER, J. (pp. 1356-59), delivered a separate opinion concurring in the result only.
 
 
 1
 ROSEN, District Judge.
 
 
 2
 Plaintiffs-Appellants Emery Bennett and David Mango appeal decisions of the District Court granting a motion by Defendants- Appellees City of Columbus, James P. Joyce and George J. Arnold for summary judgment, and denying Appellants' motion for summary judgment. Appellants are two Ohio citizens who claim that their right to vote on a ballot issue concerning the proposed merger of two suburban Columbus communities, the Village of New Albany (the "Village") and the unincorporated portion of Plain Township (the "Township"), has been impaired by provisions in water and sewage contracts between the City of Columbus and the Village. Those contracts call for a ten-fold increase in the water and sewer service rates paid by Village customers should the Village and the Township merge. Appellees are the City of Columbus and two Columbus officials who were involved in preparation of the contracts (hereafter collectively referred to as the "City").
 
 
 3
 In addition to the substantive appeal, we have before us two motions filed by Appellees seeking dismissal on various jurisdictional grounds. Because we find that Appellants lack standing to bring their claims, we vacate the district court decision with respect to those claims, and remand with instructions to dismiss those claims.
 
 I. PROCEDURAL AND FACTUAL BACKGROUND
 
 4
 Appellants commenced this action on February 11, 1994, asking the District Court to remove what they perceived to be an unconstitutional burden on their right to vote in the upcoming November 8, 1994, election on the proposed merger between the Village of New Albany and Plain Township, two communities on the outskirts of the City of Columbus. They were joined in their suit by two New Albany officials, the Village mayor and a member of the Village Council, who asserted claims in both their official and individual capacities, and the Village itself, which asserted state law claims. Cross-motions for summary judgment were filed on April 11, 1994. By opinion and order dated June 2, 1994, District Court Judge Beckwith granted Appellees' motion on Appellants' federal claims and denied Appellants' motion. Judge Beckwith then dismissed the Village's state law claims without prejudice for want of jurisdiction.
 
 A. The Water and Sewage Contracts
 
 5
 Appellants' constitutional claims are based on provisions in water and sewage contracts between the Village and the City. In 1988, the Ohio Environmental Protection Agency found that existing water and sewage facilities in the Village violated state environmental laws, and ordered the Village to construct new facilities. The Village complied by entering into contracts for water and sewage services with its neighbor, the City of Columbus. Both contracts contain the following clauses:
 
 
 6
 Section 15. As a further consideration for this agreement the Village of New Albany agrees that it will take no action whatsoever to pursue merger with Plain Township pursuant to Section 709.43 through 709.48 of the Ohio Revised Code or any revision of or amendment to said sections. In consideration of the agreement of the Village of New Albany contained in this paragraph and as further consideration for this agreement the City of Columbus agrees as follows:
 
 
 7
 (a) Except for the road right-of-way the City of Columbus will not accept any annexation of those properties seven acres or less in size in Plain Township, Ohio unless owners of said properties have either signed the petition for annexation or request in writing that the City of Columbus accept said annexation pursuant to Section 709.02 through 709.21 of the Ohio Revised Code or any revision of or amendment to said sections.
 
 
 8
 * * * * * *
 
 
 9
 Section 16. The parties recognize that merger pursuant to section 709.43 through 709.46 of the Ohio Revised Code or any revision or amendment to said sections could occur without the act of the Village of New Albany. It is the conclusion of the parties that provision for water and sewer service to the Village of New Albany and a reasonable area within Plain Township is a more reasonable resolution of water and sewer service than merger. Accordingly, it is agreed by the parties that in the event merger between the Village of New Albany and Plain Township should occur, the City of Columbus shall incur no obligation to serve areas other than those specifically referred to in this contract. The parties further agree that as of the effective date of said merger, the rates chargeable hereunder shall become ten times those set forth in Section 8 hereof. The Village of New Albany consents to the provisions set forth in this section as related to the cost and expense of providing continued services under this Agreement and not as an exaction, tax or penalty in the event the conditions imposing this section occur. Further, the Village of New Albany consents and agrees that the provisions in this section are not confiscatory nor unreasonable.
 
 
 10
 (J.A. at 100-01.) These service contracts were unanimously approved by both the New Albany Village Council and the Columbus City Council.
 
 B. The Merger Process
 
 11
 Under Ohio law, merger of two communities is a multi-step process governed by sections 709.43 through 709.48 of the Ohio Revised Code. The first step requires filing of a petition with the board of elections. The petition must include a certain number of signatures from registered voters in the affected communities, and must contain the names of five individuals from each community who would be willing to serve on a merger commission. Ohio Rev.Code Ann. § 709.45. If a proper petition is submitted to the board of elections at least 75 days before the next scheduled general election, the board must place the following question on the ballot: "Shall a commission be chosen to draw up a statement of conditions for merger of the political subdivisions of _____, _____, and _____?" Ohio Rev.Code Ann. § 709.45.
 
 
 12
 If a majority of voters in each involved community agrees to form a merger commission, the code instructs the designated commissioners "to meet as often as necessary to formulate conditions for merger that are satisfactory to a majority of the members of such commission from each political subdivision." Ohio Rev.Code Ann. § 709.46. Assuming the commission reaches agreement, the conditions of merger are then submitted to the board of elections and placed on the ballot for the next general election. However, "[r]egardless of whether a merger commission of a township and a municipal corporation succeeds in reaching agreement, the commission shall cease to exist on the seventy-fifth day prior to the next general election after the commission is elected." Ohio Rev.Code Ann. § 709.46. Finally, if merger is rejected by the voters at either stage--either the commission formation stage or the conditions of merger stage--Ohio law forbids the filing of any new merger petitions for at least three years after the date of such disapproval. Ohio Rev.Code Ann. §§ 709.46, 709.47.
 
 
 13
 The voters of the Village of New Albany and Plain Township approved formation of a merger commission on November 2, 1993. This lawsuit was filed by Appellants on February 11, 1994. As of that date, the merger commission formed pursuant to the 1993 election had not yet submitted conditions of merger to the board of elections. Under the terms of the Ohio statute, they had until August 25, 1994, to do so. Subsequently, the commission filed conditions with the board of elections in a timely manner.
 
 
 14
 The merger proposal was placed on the November 8, 1994, ballot, and was defeated. A majority of Plain Township voters supported the merger; however, Village voters rejected the proposal by a margin of approximately two to one (747 to 367).
 
 C. The Parties to this Appeal
 
 15
 Appellant David M. Mango has been a resident of the Village for 22 years. He is registered to vote, and stated in his deposition that he intended to vote in the November 8, 1994, general election. However, he is neither a water nor a sewer customer of the City. Appellant Emery A. Bennett is a resident of Plain Township and a former resident of the Village. Bennett still owns his former Village residence, and is a City water customer at that address. Bennett is also a registered voter, and also stated in his deposition that he intended to vote in the November 8, 1994, election. Furthermore, both Mango and Bennett pay property taxes on property they own within the two communities. Consequently, if utility rates were increased, the Plain Local School District would be subject to those higher rates, and Appellants' property taxes presumably would increase correspondingly.
 
 
 16
 D. The Purpose and Effect of the Contracts' Rate Increase Provisions
 
 
 17
 Because the District Court concluded that under no circumstances could the water and sewage contract provisions be considered an unconstitutional burden on Appellants' right to vote, some factual issues remain unresolved. In particular, the parties dispute the purpose of the contract clauses imposing ten-fold rate increases in the event of merger.
 
 
 18
 According to Appellants, the ten-fold rate increase bears no relationship to any actual increased cost of providing water or sewage services should the Village merge with the Township. Rather, Appellants contend that the increase serves solely as a penalty which would produce a windfall of millions of dollars for the City of Columbus if merger were to occur.
 
 
 19
 Appellants thus contend that the City used the water and sewage contract provisions solely as vehicles for the prevention of merger. As support for this contention, they cite the deposition testimony of Michael D. Long, the City's chief negotiator for the contracts:
 
 
 20
 Q: So the administration's policy was essentially to incorporate that language in order to prevent mergers; is that correct?
 
 
 21
 A: In order to be able to maintain the ability of Columbus's growth policy; in order to have that policy in place, that was the intent, to have Columbus continue to be able to grow as they had for the last 30 or 40 years.
 
 
 22
 Q: But in order--Based on the policy that you talked about, in order for them to accomplish that growth policy, they needed to incorporate this language to prevent merger, didn't they?
 
 
 23
 A: That language or something similar to it.
 
 
 24
 * * * * * *
 
 
 25
 I don't know how that number [i.e., the ten-fold increase] was exactly arrived at, other than, it was a number that both parties felt would indicate--that this was an important issue to both parties and that there was--you know, in the event that the merger would occur, that there was the ten-fold increase, that would be a number that would, you know, cause you to think about--you know, make a decision.
 
 
 26
 Q: Make a decision at the voting poll?
 
 
 27
 A: That your rates were going to increase under that condition.
 
 
 28
 Q: If I voted for merger?
 
 
 29
 A: If the condition of merger occurred, yes.
 
 
 30
 * * * * * *
 
 
 31
 It was probably, you know, just kind of what seemed like a number that would cause someone to think about this--this decision.
 
 
 32
 (Appellant Br. at 10 (quoting Long Dep. at 95-100).)
 
 
 33
 Appellants claim merger would not impose any costs on the City's water or sewage systems. According to Appellants, merger would not require the City to serve any new customers; would not require it to expand its service area because other contract provisions prevent this; and would not require it to provide capital improvements to any new area. Furthermore, merger would not limit the system's customer base, because it would not prevent the City from expanding its service area to add new customers in the merged Plain Township. Thus, apart from frustrating Columbus' policy of reserving unincorporated areas for its own expansion, Appellants assert that merger would have no adverse effect on Columbus.
 
 
 34
 Appellees, however, argue that the purpose of the rate increase is to protect the City's investment in the Village of New Albany. The City claims that it will expend between 18 and 21.3 million dollars to extend the necessary infrastructure in order to meet its obligations under the utility contracts. The City also contends that the contracts with the Village were different from previous contracts made by the City with neighboring communities, because they required the City to construct a "trunk and the sub-trunk system." (Appellee Br. at 9.)
 
 
 35
 Furthermore, the utility contracts themselves state that the rate increase is "related to the cost and expense of providing continued services under this Agreement," and is "not ... an exaction, tax or penalty." The increased rate, according to the City, was included in the contracts because "[i]f merger occurs, it would eliminate Columbus' potential to grow and add new water and sewer customers to recoup the investment through its standard rate structure." (Appellee Br. at 9.) At the very least, the City argues, the provision was not designed solely to prevent merger. Rather, the City suffers a detriment from the merger because "it prohibits or impedes the City from expanding its municipal borders" and "reaping the tax benefits," and prevents "the City from recouping its capital investment for the facilities that it has installed." (Appellee Br. at 10.)
 
 
 36
 The parties also dispute the effect the rate increase provisions had on voters' decisions whether to support or oppose the merger. Based on the City's efforts to publicize the provisions prior to the 1993 election and while the merger commission was meeting, Appellants infer that the City evidently believed that the provisions would dampen support for the merger. In particular, Appellants allege that a group of City officials drafted and sent letters to Village officials reminding them of the possible rate increases and the contract provisions that prohibited Village officials from assisting in the merger process. Appellants contend that these letters suppressed "all forms of political expression by Village officials." (Appellant Br. at 15.)
 
 
 37
 Moreover, Appellants allege that "the specter of a ten-fold increase ... dominated" the meetings of the merger commission. (Appellant Br. at 16.) Finally, Appellants state that the voters deposed in this suit "uniformly testified" that the possible rate increase would influence their voting. (Appellant Br. at 17.)
 
 
 38
 In response, Appellees first note that, despite any actions City officials might have taken to oppose the merger, the voters nevertheless approved formation of a merger commission and the commission successfully adopted conditions for merger. Appellees next cite a number of reasons why voters might have decided to support or oppose merger. For example, merger opponents have mentioned diminished police services, school boundary changes, road maintenance concerns, and different taxing schemes as reasons for voting against merger. In addition, many of those who voted on the merger proposal were not City water or sewage customers, and thus would have been unaffected by any rate increase. Appellees conclude that the contractual rate increases were simply one factor among many that the electorate might have considered in casting their votes.
 
 II. THE DISTRICT COURT DECISION
 
 39
 The District Court granted summary judgment to Appellees based on its conclusion that Appellants had failed to demonstrate infringement of their voting rights. The court found that unconstitutional infringement of the right to vote could not be established merely by pointing to a ballot issue's potential "economic consequences or negative effects on the personal economic status of a voter." The court reasoned:
 
 
 40
 In Ohio a voter's property tax can be affected by school levies and bond issues, and Chapter 5705 Ohio Revised Code provides for tax levies for mental health, zoos, children's services, senior citizens, and other services. In fact, imposition of a municipal income tax over 1% must be approved by the voters. If Plaintiffs are correct that if detrimental economic consequences are the result of an election, there is an unconstitutional infringement upon the right to vote, the very essence of political campaigns and public financing throughout the country would be in jeopardy.
 
 
 41
 (J.A. at 34.)
 
 
 42
 The court also rejected an argument that the Constitution prohibits a state from conditioning a benefit, such as water or sewage services, on the surrender of an individual's constitutional right. The court stated:Neither the premise nor legal proposition of this argument is accurate. Under Ohio law, Plaintiffs have no entitlement to utility services.... Lacking such entitlement, Plaintiffs' voting rights are not implicated or unconstitutionally burdened merely because there may be economic consequences as a result of the outcome of any potential merger vote....
 
 
 43
 Where the government chooses to extend a benefit or subsidy that is not constitutionally required, or where there is no entitlement, the government may attach terms and conditions to such subsidy without violating constitution[al] rights. See Grove City College v. Bell, 465 U.S. 555 [104 S.Ct. 1211, 79 L.Ed.2d 516] (1984). Unless there is an independent constitutional bar, which the Court does not find in this case, the government may condition the extension of benefits upon the recipient taking, or not taking certain action. See South Dakota v. Dole, 483 U.S. 203 [107 S.Ct. 2793, 97 L.Ed.2d 171] (1987).
 
 
 44
 These utility contracts do not prevent any individual elector from exercising the franchise. The economic consequences which may befall the citizens of New Albany should they elect to merge with Plain Township do not rise to the level of unconstitutional burdens on the right to vote.
 
 
 45
 (J.A. at 10.)
 
 
 46
 III. APPELLEES' FIRST MOTION TO DISMISS: RIPENESS AND STANDING
 
 
 47
 Appellees seek dismissal of this appeal due to lack of jurisdiction, asserting that there is no "case" or "controversy" within the meaning of Article III, § 2, of the United States Constitution. This argument was neither raised before nor addressed by the District Court, but was noted in the City's answer to Appellants' complaint. Appellees' first motion to dismiss was filed prior to the November 8, 1994, election.
 
 
 48
 Appellees advance two bases for this Court's lack of jurisdiction. First, they argue that the controversy was not ripe for adjudication on the date the complaint was filed. Second, they contend that Appellants Mango and Bennett lack standing to bring the claims raised in their complaint.
 
 
 49
 A. Appellants' Claims are Ripe for Adjudication.
 
 
 50
 The City contends that Appellants' complaint was not ripe for judicial review at the time it was filed. The complaint was filed on February 11, 1994; as of that date, the merger commission had not yet submitted conditions of merger to the board of elections. If the commission had failed to submit conditions to the board by August 25, 1994, the merger proposal would not have appeared on the November 8, 1994, ballot. The City thus concludes that Appellants could assert no infringement of their voting rights as of February 11, 1994, because they were not yet assured of an opportunity to vote on a merger.
 
 
 51
 Alternatively, based on its interpretation of Appellants' injury as the actual imposition of a ten-fold utility rate increase, the City argues that Appellants' complaint was not ripe even after the commission filed its conditions. Noting that the contract provisions calling for ten-fold rate increases would only apply upon merger, the City reasons that the mere presence of a merger proposal on the ballot does not ensure that merger will occur. Under this view of Appellants' injury, therefore, Appellants' claims are not ripe until a merger proposal actually is approved by the voters.
 
 
 52
 Although standing and ripeness are considered separate issues, in practice they involve overlapping inquiries. If no injury has occurred, the plaintiff could be denied standing or the case could be dismissed as not ripe. The question whether an alleged injury is sufficient to meet the constitutional "case or controversy" requirement is at the heart of both doctrines. The ripeness doctrine generally applies in cases such as this one, in which a party seeks a declaratory judgment based on pre-enforcement review of a statute or regulation, or, as in this case, of contract provisions. As this Court stated in an earlier case:
 
 
 53
 In declaratory judgment actions it is often difficult to draw a line between actual controversies and attempts to obtain advisory opinions on the basis of hypothetical controversies. Writing for a unanimous Supreme Court in Golden v. Zwickler, 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969), Justice Brennan adopted the following test:
 
 
 54
 "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy. Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment."
 
 
 55
 Id. at 108, 89 S.Ct. at 959 (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941)).
 
 
 56
 Michigan State Chamber of Commerce v. Austin, 788 F.2d 1178, 1181 (6th Cir.1986). The Supreme Court also has stated that its determination whether a case is ripe focuses on two considerations: "the hardship to the parties of withholding court consideration" and "the fitness of the issues for judicial decision." Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967); see also Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752 (1983).
 
 
 57
 The Supreme Court typically has found hardship when enforcement of a statute or regulation is inevitable and the sole impediment to ripeness is simply a delay before the proceedings commence. For example, in Blanchette v. Connecticut Gen. Ins. Corps., 419 U.S. 102, 139-45, 95 S.Ct. 335, 356-59, 42 L.Ed.2d 320 (1974), the Court deemed ripe an action brought by eight major railroads challenging the conveyance of their property to Conrail. Although a reorganization plan had not yet been formulated and a special court had not yet ordered the conveyances, the Court reasoned that "[w]here the inevitability of the operation of a statute against certain individuals is patent, it is irrelevant to the existence of a justiciable controversy that there will be a time delay before the disputed provisions will come into effect." 419 U.S. at 143, 95 S.Ct. at 358. Similarly, in Buckley v. Valeo, 424 U.S. 1, 113-18, 96 S.Ct. 612, 680-82, 46 L.Ed.2d 659 (1976), the plaintiffs were allowed to challenge the method of appointing members of the Federal Election Commission in anticipation of "impending future rulings and determinations by the Commission."
 
 
 58
 If we accept Appellants' characterization of their injury as denial of a meaningful vote,[1] the City's second argument against ripeness--i.e., that Appellants suffer no injury until merger is approved--is obviously without merit. Appellants contend that the City has improperly skewed the electorate's decision on the merger issue by contractually imposing a financial penalty on merger. Thus, it is the threat of economic hardship to Appellants and their fellow voters, rather than the actual imposition of higher utility rates, that allegedly skews their voting decisions. Accordingly, if and when rates increase, the harm about which Appellants complain will already have taken place.
 
 
 59
 The City's first argument--i.e., that the complaint was not ripe at the time it was filed--presents a closer question. At the time of filing, it was indeed possible that the merger commission might not have submitted conditions of merger to the board of elections in a timely manner. If so, there would have been no election to skew. However, the voters had elected a commission. Moreover, given the fact that the commission members, almost by definition, were all in favor of merger, it was highly probable that they would complete their task and file conditions of merger. Finally, if Appellants had waited until after the commission reached agreement to file their lawsuit, they might have had as few as 75 days to convince the courts to intervene. This short time period would have virtually assured completion of the election process prior to a court ruling.[2]
 
 
 60
 Another panel of this Court was presented with a similar problem in Michigan State Chamber of Commerce v. Austin, 788 F.2d 1178 (6th Cir.1986). In that case, the Michigan State Chamber of Commerce and three large investor-owned public utilities challenged a Michigan law that restricted the amount of money corporations could contribute to a "ballot question committee," a group that advocates either passage or defeat of a ballot proposal or constitutional amendment under consideration in a general election. 788 F.2d at 1179. The utilities anticipated that ballot issues to which they were opposed would be placed on the ballot in the near future, but at the time of their lawsuit no such issues had been approved for any pending general election. 788 F.2d at 1179.
 
 
 61
 State law permitted ballot proposals to be certified as few as forty-nine days prior to an election. 788 F.2d at 1183 (citing Mich.Comp.Laws Ann. § 168.480). Given this brief period of time between certification and election, the plaintiffs argued that they could not possibly bring an action after certification and still obtain injunctive relief prior to the election. 788 F.2d at 1179. The defendant responded that the action was not ripe because the plaintiffs had "failed to allege and specifically identify any particular question which [would] be appearing on the ballot in the future." 788 F.2d at 1179. The district court dismissed the case as not ripe. 788 F.2d at 1181.
 
 
 62
 The Sixth Circuit reversed, reasoning as follows:
 
 
 63
 Though [First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978) ] dealt primarily with mootness, there is implicit in that decision a holding that ripeness does not require the immediacy imposed by the district court in this case. The Bellotti Court made clear that a plaintiff seeking to express its views on a ballot proposal must have a reasonable time before the election date in which to wage its campaign. 435 U.S. at 774, 98 S.Ct. at 1414. In Bellotti the time between legislative authorization of the proposal and submission to the voters was approximately 18 months. "This proved too short a period of time for appellants to obtain complete judicial review, and there is every reason to believe that any future suit would take at least as long." Id.
 
 
 64
 * * * * * *
 
 
 65
 The requirement imposed by the district court in the present case would certainly not provide an opportunity for complete judicial review. The court held that the Citizens Lobby proposal could not furnish a basis for a justiciable controversy because it had not been certified and because the time for certification in 1984 had expired. The requirement that the Citizens Lobby proposal be certified--a step that can occur as late as seven weeks before election day--as an absolute condition for finding an actual case or controversy deprived the plaintiffs of any realistic opportunity for an adjudication prior to the election.
 
 
 66
 788 F.2d at 1183. The court dismissed the arguments of the defendant that the ballot issue might not qualify in 1986, nor perhaps ever. "This argument disregards the fact that the Citizens Lobby had succeeded in placing initiatives on the ballot in 1974, 1976 and 1982 and that its executive director had confirmed by affidavit that the organization continued to circulate petitions for the very proposal that the utilities sought to oppose by contributions to a committee." 788 F.2d at 1185.
 
 
 67
 Applying the Austin rationale to the instant case, Appellants' claims could be found ripe if they could show that, at the time they filed the complaint, the merger proposal was likely to be presented to the voters in the upcoming November, 1994 election, and that they could not have obtained timely injunctive relief had they waited until the merger proposal actually was placed on the ballot to file suit.[3] Alternatively, Appellants' claims would be ripe if we view them as asserting that the contract provisions in question skew both elections in the multi-step merger process. In other words, these provisions, if left unchanged, could skew not only the voters' decision whether to approve the merger proposal, but also the voters' decision whether to form a commission to define the conditions of merger. Given this multi-step merger process, Appellants arguably picked the "most ripe" time to file their complaint by waiting until after the commission was formed but acting before the voters determined the fate of the merger proposal.
 
 
 68
 We conclude that Appellants' complaint is ripe for adjudication. Although placement of the merger proposal on the November 1994 ballot was not absolutely certain at the time the complaint was filed, it was highly likely. Furthermore, given the unique time constraints introduced by the multi-step merger process, we believe that the contract provisions in question were as amenable to judicial consideration at the time the complaint was filed as they would have been at some later date.
 
 
 69
 B. Appellants Lack Standing to Bring a Vote Dilution Claim.
 
 
 70
 In order for a federal court to exercise jurisdiction over a matter, the party seeking relief must have standing to sue. Standing has both constitutional and prudential dimensions. The constitutional requirements for standing emanate from Art. III, § 2, of the U.S. Constitution, which grants federal courts jurisdiction over "cases" and "controversies." The Supreme Court recently revisited the constitutional dimension of a federal court's standing inquiry:
 
 
 71
 Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements: First, the plaintiff must have suffered an "injury in fact"--an invasion of a legally-protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of--the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."
 
 
 72
 Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations and footnote omitted).
 
 
 73
 The Court next described the standards for determining whether a plaintiff has satisfied these three constitutional requirements:
 
 
 74
 The party invoking federal jurisdiction bears the burden of establishing these elements. Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim."
 
 
 75
 504 U.S. at 561, 112 S.Ct. at 2136-37 (citations omitted).
 
 
 76
 Thus, in order to resolve the standing inquiry in this case, we must determine whether Appellants have suffered an injury that is both traceable to the City's actions and redressable by the courts. Appellants bear the burden in this inquiry. However, because we are considering a motion to dismiss, we "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).[4] With these principles in mind, we address in turn the three constitutional elements of standing.
 
 1. Injury in Fact
 
 77
 In order to establish the "injury in fact" element of standing, "[t]he plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct;" moreover, "the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.' " City of Los Angeles v. Lyons, 461 U.S. 95, 101-102, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983) (citations omitted). Put another way, the injury must be both "concrete and particularized," meaning "that the injury must affect the plaintiff in a personal and individual way." Defenders of Wildlife, 504 U.S. at 560 & n. 1, 112 S.Ct. at 2136 & n. 1.
 
 
 78
 In Lyons, supra, the Supreme Court focused on the "immediate" and "particularized" aspects of the injury-in-fact requirement. The plaintiff in that case challenged the use of chokeholds by the Los Angeles Police Department. 461 U.S. at 97-98, 103 S.Ct. at 1663. After being stopped by the police and subjected to a chokehold, Lyons sought both damages and an injunction barring future use of the chokehold absent an immediate threat of deadly force. 461 U.S. at 97-98, 103 S.Ct. at 1663. Because Lyons did not show that he was likely to be subjected to another chokehold in the future, the Supreme Court concluded that Lyons lacked standing to seek injunctive relief:
 
 
 79
 Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.
 
 
 80
 461 U.S. at 111, 103 S.Ct. at 1670. Thus, regardless of the constitutionality of the chokehold, Lyons could not satisfy the injury-in-fact element of standing in his claim for injunctive relief. Because he was unable to show that he was likely to fall victim to the chokehold again, he could assert no immediate and personal threat of injury.
 
 
 81
 In the instant case, the City first construes Appellants' injury as the threat of higher water and sewage rates, and then concludes that Appellants, like the plaintiff in Lyons, cannot establish an immediate and personal threat of injury. If merger were approved and utility rates increased, Mango, who is neither a water nor a sewage customer, would not suffer financially. As for Bennett, who is a City water customer, the City contends that his threat of injury is not immediate, because the City might choose not to raise utility rates even if merger were approved. Finally, insofar as Appellants' complaint alleges an impairment of their voting rights, the City points out that the contract provisions in question neither prevent Appellants from voting nor compel a vote against merger.
 
 
 82
 Appellants attack these arguments at both a factual and a more basic level. First, they note that a utility rate increase will harm Mango even though he is not a City water or sewage customer; as a property owner, he would have to pay increased property taxes to cover the higher utility costs imposed on the Plain Local School District. Appellants also point out that the water and sewage contracts call for an automatic ten-fold rate increase on the effective date of any merger. Appellants conclude that the threatened rate increases affect them both personally and immediately.
 
 
 83
 Moreover, Appellants charge that the City has fundamentally mischaracterized the nature of the injury they have alleged. Their complaint derives from their constitutional right to cast a meaningful vote. Their asserted injury is not an increase in utility rates, but rather an impairment of their right to vote. They argue that they suffer this injury regardless of whether they personally are threatened with increased utility rates, and regardless of whether they personally feel compelled to vote one way or the other. In their view, the threat of increased utility rates skews the electoral process by providing an improper incentive for a substantial number of voters to avoid the rate increase by voting against merger. Appellants conclude that their votes, much like the vote of an individual in a gerrymandered district, are diluted by the economic threat directed at a large percentage of Village voters.
 
 
 84
 Viewed this way, Appellants' alleged injury is distinguishable from the injury complained of in Lyons. Appellants do not seek to enjoin an allegedly unconstitutional practice that has no direct impact on them. Rather, as members of the class of voters who will determine the fate of the merger proposal, Appellants are personally affected by any action that improperly impairs the ability of that class to cast meaningful votes. If the impairment alleged by Appellants rises to the level of a judicially cognizable injury to their constitutional right to cast a meaningful vote, Appellants clearly suffer this injury as much as anyone else who intends to vote on the merger proposal.
 
 
 85
 Moreover, Appellants correctly point out that several courts, including this one, have at least implicitly recognized dilution of voting power as an injury sufficient to confer standing. See, e.g., City of Detroit v. Franklin, 4 F.3d 1367, 1372-74 (6th Cir.1993) (considering standing under a theory of vote dilution, but finding no standing due to failure to establish the causation element), cert. denied, 510 U.S. 1176, 114 S.Ct. 1217, 127 L.Ed.2d 563 (1994); Rosen v. Brown, 970 F.2d 169, 176 (6th Cir.1992) (affirming a grant of summary judgment for plaintiffs on their vote impairment claim, but not addressing plaintiffs' standing); Michel v. Anderson, 14 F.3d 623, 626 (D.C.Cir.1994) ("The Supreme Court has repeatedly held that voters have standing to challenge practices that are claimed to dilute their vote, such as being placed in a voting district that is significantly more populous than others." (citations omitted)); see also Briggs v. Ohio Elections Comm'n, 61 F.3d 487, 492 (6th Cir.1995) (finding that the abstract nature of First Amendment values is not a basis for denying standing to bring a First Amendment challenge). We therefore agree that the City has misconstrued Appellants' alleged injury in its assertion that Appellants have not established the "immediate" and "particularized" elements of that injury.
 
 
 86
 However, Appellants' attempt to show "injury in fact" faces a more fundamental challenge. Appellants' designation of their injury as dilution of voting power cannot pass without scrutiny. Rather, this Court must determine whether Appellants' complaint asserts a judicially cognizable injury, or whether their alleged injury instead is the product of speculation and conjecture. Although the Supreme Court has noted that "the constitutional component of standing doctrine incorporates concepts concededly not susceptible of precise definition," Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984), the Court has provided the following guidance in our inquiry:
 
 
 87
 Like most legal notions, the standing concepts have gained considerable definition from developing case law. In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases....
 
 
 88
 Determining standing in a particular case may be facilitated by clarifying principles or even clear rules developed in prior cases. Typically, however, the standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be considered judicially cognizable? Is the line of causation between the illegal conduct and injury too attenuated? Is the prospect of obtaining relief from the injury as a result of a favorable ruling too speculative? These questions and any others relevant to the standing inquiry must be answered by reference to the Art. III notion that federal courts may exercise power only "in the last resort, and as a necessity," and only when adjudication is "consistent with a system of separated powers and [the dispute is one] traditionally thought to be capable of resolution through the judicial process."
 
 
 89
 Allen, 468 U.S. at 751-52, 104 S.Ct. at 3325 (citations omitted). Accordingly, we first turn to case law to determine the nature and scope of the right to cast a meaningful vote. This examination reveals two key differences between the voting injuries addressed in prior cases and the injury asserted by Appellants here.
 
 
 90
 First, the classic vote dilution cases involve injuries that can be established with mathematical certainty. For example, in Wesberry v. Sanders, 376 U.S. 1, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964), the Supreme Court struck down a Georgia statute that had apportioned the state's population into congressional districts in such a way that the plaintiff voters' district had two to three times the population of some other districts.
 
 
 91
 Similarly, although the recent case of Michel v. Anderson, 14 F.3d 623 (D.C.Cir.1994), involved a more attenuated claim of vote dilution, the court nonetheless was presented with a set of facts under which dilution could be numerically ascertained. In that case, the court found that voters had standing to challenge a House of Representatives rule granting delegates from U.S. territories and the District of Columbia the right to vote in the House Committee of the Whole. 14 F.3d at 624, 626. The court reasoned that the granting of committee votes to delegates meant that the committee votes cast by the plaintiff voters' representatives would be correspondingly less valuable. 14 F.3d at 626. Although acknowledging that the voters' asserted injury was "derivative" of their representatives' diluted committee votes, the court nevertheless found the injury judicially cognizable, because it differed only in degree, not in kind, from a complete denial of their representatives' right to vote. 14 F.3d at 626.
 
 
 92
 In contrast, Appellants here cannot mathematically establish their vote dilution claim, but can only contend that the water and sewage contract provisions distort the political landscape surrounding the merger proposal in a constitutionally significant way. Such an assertion obviously is not readily capable of proof, and Appellants therefore confront a substantial obstacle in their attempt to demonstrate concrete injury.[5] We are not alone in our concern that the type of injury Appellants assert is highly conjectural. In Colorado Taxpayers Union, Inc. v. Romer, 963 F.2d 1394 (10th Cir.1992), cert. denied, 507 U.S. 949, 113 S.Ct. 1360, 122 L.Ed.2d 739 (1993), the court held that the Libertarian Party lacked standing to pursue a claim that Governor Romer infringed the Party's First Amendment rights "by using state resources and the power and prestige of his office to oppose" a Colorado statewide ballot proposal. 963 F.2d at 1395. The court found that the Party's "argument that they were forced to counteract the Governor's activities through the expenditure of additional funds is purely conjectural." 963 F.2d at 1397. The court thus concluded that the Libertarian Party had at most "received a minor setback to its organizational purpose," rather than suffering a "distinct and concrete injury." 963 F.2d at 1397; see also Albanese v. Federal Election Comm'n, 884 F.Supp. 685, 692 (E.D.N.Y.1995) (finding a challenge to federal election financing laws under a vote dilution theory distinguishable from malapportionment cases, and concluding that plaintiffs' claimed vote dilution injury "is abstract and remote in comparison to those in the precedents cited in its support").
 
 
 93
 Next, vote dilution complaints typically are directed at the governmental entity responsible for conducting the challenged election. For example, in Rosen v. Brown, 970 F.2d 169 (6th Cir.1992), this Court considered a claim by an Independent candidate for the Ohio House of Representatives, a registered voter in the candidate's district, and a nonprofit organization that the State of Ohio's refusal to designate the candidate as "Independent" on the ballot violated the First and Fourteenth Amendments. Under state law, candidates of political parties had such designations as "Democrat" or "Republican" placed under their names on the ballot, but candidates not affiliated with a party were not entitled to any designation whatsoever. 970 F.2d at 174. The court explicitly recognized that the state law implicated the right to cast a meaningful vote:
 
 
 94
 The primary concern in any ballot access case is not the interests of the candidate but of the voters who support the candidate and the views espoused by the candidate. The voter interests at stake are basic associational rights secured against state action by the First and Fourteenth Amendments, and any restriction on ballot access by candidates necessarily burdens the rights of their supporters to some extent.
 
 
 95
 * * * * * *
 
 
 96
 ... [The evidence offered by plaintiffs' expert witnesses] show[s] that the State infringes upon the right of supporters of Independent candidates to meaningfully vote and meaningfully associate by providing a "voting cue" to Democratic and Republican candidates which makes it virtually impossible for Independent candidates to prevail in the general election.
 
 
 97
 970 F.2d at 175-76. After undertaking a balancing test that weighed the injury to the plaintiffs against the interests put forward by the state as justification for its law, the court concluded that the Ohio law was unconstitutional, and thus affirmed the district court's grant of summary judgment for the plaintiffs. 970 F.2d at 175-78.
 
 
 98
 Appellants contend that Rosen conclusively establishes that their alleged injury is judicially cognizable. We disagree, as we find that Rosen differs from the instant case in an important way. The challenge in Rosen was to the electoral process itself, and, more particularly, to the government's preparation of the offending ballot pursuant to its responsibility to conduct the election. The state's act of preparing a ballot that favored some candidates over others violated the state's duty to impartially administer the election. In preparing such a ballot, the state also violated the rights of those voters who supported the disfavored candidates.
 
 
 99
 In contrast, the City here is an outside, albeit highly interested, party that seeks to influence the result of the merger vote. The City, therefore, is not in a position to directly distort the electoral process by preparing an improper ballot, as the State of Ohio did in Rosen, in order to achieve the result it desires. Rather, the City can only exert external pressure on those citizens of neighboring communities who will decide the merger issue. The type of state action considered in Rosen clearly poses a more obvious and immediate threat to the right to cast a meaningful vote, because the state holds itself out to the voters as the neutral administrator of the election, while at the same time predisposing the electoral process to favor some candidates over others. In contrast, the City here promises no neutrality and consequently fools nobody; indeed, the City has rather clearly expressed its desire to see the merger proposal defeated. Because the City is not conducting the merger election, Rosen imposes no duty upon the City to refrain from choosing sides in that election.
 
 
 100
 Although straightforward application of Rosen does not reveal a judicially cognizable injury here, Appellants could perhaps establish such an injury if they could show that the particular nature of the City's attempt to influence the election somehow renders it constitutionally problematic. Appellants contend that two suspect features mark the City's attempt to influence the merger vote. First, by claiming that Rosen is dispositive of their vote dilution claims despite the evident factual differences between that case and the instant matter, Appellants seem to believe that the City's position as a "state actor" dictates strict neutrality, even when the City is not acting in its role as administrator of elections. Next, Appellants point to the alleged absence of any economic justification for the contractual ten-fold rate increase in the event of merger, and conclude that such a "penalty" constitutes an improper electoral influence.
 
 
 101
 We reject both of these attempts to stretch Rosen to reach the instant matter. First, Rosen clearly does not suggest that state actors are flatly prohibited from taking positions on issues that will be decided through the electoral process, regardless of the role in which the state is acting.[6] The City here is not conducting an election, but instead is functioning as the municipal representative of its citizens. In negotiating contracts to provide water and sewage services to a neighboring community, the City had the duty to ensure that the contracts served the interests of its citizens. Those interests, in the judgment of the City's elected officials, could best be served by including contractual provisions that would discourage merger. That the interest of the City and its citizens in avoiding merger was manifested in part through measures that might influence voters in surrounding communities does not, in our judgment, render the City's actions improper.[7] Rather, we believe that the City, when acting as a municipal contract negotiator, could properly invoke any legal means to discourage merger.[8]
 
 
 102
 Next, given that the City is not completely prohibited from seeking to influence the outcome of the merger election, we see no reason why the propriety of its particular attempt in this case should turn on the effectiveness of the means adopted. Appellants contend that a ten-fold rate increase exceeds any possible economic justification, and deduce that the increase must be punitive. However, labelling the ten-fold increase as a "penalty" contributes nothing to our analysis of Appellants' alleged injury. As an initial matter, we hesitate to engage in a line-drawing exercise in which a threatened ten-fold rate increase gives rise to a judicially cognizable injury while, for example, a threatened two-fold increase might not.
 
 
 103
 More significantly, we decline Appellants' implicit invitation to uncover and weigh the motives behind the City's attempt to discourage merger. It is unclear what reasons the City might have to "punish" Village and Township voters. Rather, it appears that the City has various political and economic reasons for opposing the merger, and for those reasons the City seeks to influence Village and Township voters to oppose the merger. Because some of these reasons undoubtedly are intangible or difficult to quantify, one cannot expect the rate increases called for in the contracts to simply and precisely reflect the "actual costs" merger would impose on the City.[9] Given the impossibility of measuring the extent of the City's "legitimate" interest in opposing merger, we find it inappropriate to require a close fit between the "costs" of merger and the City's attempts to discourage merger. Accordingly, we conclude that the City's alleged inability to show that the ten-fold rate increases are based entirely on economic factors does not give rise to the inference that the City's attempt to discourage merger is somehow improper.
 
 
 104
 In summary, we find that Appellants' asserted injury does not flow ineluctably from prior cases considering the nature and scope of the right to cast a meaningful vote. Neither have Appellants suggested a principled basis for extending the reasoning of those cases to apply to the instant matter. To the contrary, given our reluctance to carefully scrutinize and weigh the political influences that shape election results in an attempt to ensure an ill-defined "level playing field," and given the City's role as an interested outsider in the merger election, we find ample grounds for declining to extend the "vote dilution" theory to reach Appellants' claims.[10] We conclude that the injury alleged by Appellants is too conjectural, and too readily distinguishable from voting rights injuries recognized in the case law, to satisfy the "injury in fact" element of the constitutional dimension of standing.[11]
 
 2. Causation and Redressability
 
 105
 Having addressed the "injury in fact" element, a plaintiff next must allege that this injury is "fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." Allen v. Wright, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Causation and redressability are related elements of standing that frequently have been treated as one. Generally, if a plaintiff can demonstrate that his injuries were caused by the defendant, the courts are in a position to redress the situation. In recent years, however, the Supreme Court has treated these two requirements separately. See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555, 568-71, 112 S.Ct. 2130, 2140-42, 119 L.Ed.2d 351 (1992) (finding that redressability presented a particular obstacle to standing).
 
 
 106
 As discussed earlier, Appellants allege harm to their right to cast a meaningful vote. In order to satisfy the causation element, they further allege that this dilution in their voting power is traceable to the rate increase provisions in the Village's water and sewage contracts with the City. The City responds that this injury, assuming it exists, is not fairly traceable to the City, but instead results from the various reactions of voters to the myriad forces that might influence their votes. Moreover, because many voters were neither City water nor sewage customers, and because the Village Council unanimously approved the water and sewage contracts, the City contends that there is all the more reason to conclude that its actions did not substantially alter the political atmosphere surrounding the merger issue.
 
 
 107
 In support of its contention that its role in the merger election is too tenuous and speculative to establish causation, the City relies on Winpisinger v. Watson, 628 F.2d 133 (D.C.Cir.), cert. denied, 446 U.S. 929, 100 S.Ct. 1867, 64 L.Ed.2d 282 (1980). In that case, supporters of then-presidential candidate Edward Kennedy sued top officials in President Carter's administration to enjoin the use of government resources on behalf of Carter's attempt to secure the Democratic nomination. 628 F.2d at 135. The plaintiffs complained that these alleged abuses by Administration officials resulted in dilution of their votes and violation of their First Amendment rights. 628 F.2d at 136-37.
 
 
 108
 The D.C. Circuit Court of Appeals affirmed the district court's dismissal for lack of standing, concluding that any diminished level of voter support for Senator Kennedy in a given primary election could not be attributed to the actions of the defendants. 628 F.2d at 138-39. The court reasoned:
 
 
 109
 The endless number of diverse factors potentially contributing to the outcome of state presidential primary elections, caucuses and conventions forecloses any reliable conclusion that voter support of a candidate is "fairly traceable" to any particular event. In the case before us, whether [a plaintiff] is viewed in the character of a voter, contributor, a noncontributing supporter or a candidate for a delegate post, a court would have to accept a number of very speculative inferences and assumptions in any endeavor to connect his alleged injury with activities attributed to [the defendants]. Courts are powerless to confer standing when the causal link is too tenuous.
 
 
 110
 628 F.2d at 139 (citations omitted).
 
 
 111
 Similarly, in Shakman v. Dunne, 829 F.2d 1387 (7th Cir.1987), cert. denied, 484 U.S. 1065, 108 S.Ct. 1026, 98 L.Ed.2d 991 (1988), the Seventh Circuit considered a claim that the patronage hiring system maintained by government officials and the Democratic Party in Cook County, Illinois, placed independent candidates and their supporters at an electoral disadvantage. The court first noted the atypical nature of the plaintiffs' voting rights claim:
 
 
 112
 [T]his case is not really a challenge to the mechanics of an electoral system at all. We are not asked to evaluate any aspect of the electoral process--the procedure to get on the ballot or to obtain a place on the ballot. There is no claim that any candidate was deprived of an opportunity to run for office, to appear on the ballot, or to be given any particular place on the ballot. Nor is there any claim that a voter was deprived of the opportunity to vote for a particular candidate. Rather, the gravamen of the [plaintiffs'] complaint is that the announced hiring practice of the [defendants] provided a decided advantage in communicating with the electorate and in effectively marshalling community support for the [defendants'] political cause.
 
 
 113
 829 F.2d at 1395-96.
 
 
 114
 Turning to its standing inquiry, the court found "the line of causation between the [defendants'] activity and the [plaintiffs'] asserted injury to be particularly attenuated:"
 
 
 115
 [T]he line of causation depends upon countless individual decisions. Moreover, those countless individual decisions must depend upon, according to the [plaintiffs'] own theory of the case, countless individual political assessments that those who are in power will stay in power. It is not the hiring policy itself which creates any advantage for the incumbents. Any other candidate is entirely free to assert that, if elected, he will follow the same policy. Any advantage obtained by the incumbent is obtained only if potential workers make an independent evaluation that the incumbent, and not the opposition, will win. The plaintiffs will be at a disadvantage if--and only if--a significant number of individuals seeking political job opportunities determines the "ins" will remain the "ins."
 
 
 116
 829 F.2d at 1397. The court, citing Winpisinger in support, concluded that the plaintiffs had failed to establish the causation element of standing:
 
 
 117
 A plaintiff cannot assert injury to his viability as a candidate or his influence as a voter simply on the basis of the advantage--real or imagined--of incumbency. Such a course would require that we resolve "profound questions of political science that exceed judicial competence to answer...." Tracing the [plaintiffs'] asserted injury to the [defendants'] activity must depend on more than the attempt of a federal court to take the political temperature of the body politic.
 
 
 118
 829 F.2d at 1398 (footnote and citations omitted).
 
 
 119
 In response to the City's contention that Appellants cannot establish causation, Appellants direct our attention to Common Cause v. Bolger, 512 F.Supp. 26 (D.D.C.1980), in which a three-judge panel of the District Court for the District of Columbia expressly distinguished Winpisinger. In Bolger, a group of more than fifty candidates challenging congressional incumbents contended that the congressional franking statute was unconstitutional on its face and violated their First and Fifth Amendment rights by subsidizing campaign mailings of incumbents but not of challengers. 512 F.Supp. at 28. Like the City in the instant case, the defendants in Bolger argued that no causal link could be established between the operation of the franking statute and the election of incumbents, because any advantage provided by the franking statute was only one of many factors that might lead to the election of one candidate over another. 512 F.Supp. at 29. The plaintiffs, however, contended that the advantage provided to incumbents by the franking statute undermined the fairness of the entire campaign process, regardless of the outcome of individual elections. 512 F.Supp. at 29.
 
 
 120
 In addition to suing on behalf of candidates seeking elective office, Common Cause also sued on behalf of campaign contributors, registered voters and taxpayers.[12] 512 F.Supp. at 29. Most importantly for the case before this Court, Bolger concluded that registered voters had standing to sue:
 
 
 121
 These voters have alleged actual injury to themselves apart from electoral outcome, namely, that the franking statute places an unconstitutional burden on the congressional candidates of their choice, and thus on their right to associate freely for political purposes. The franking statute itself, they allege, burdens their political rights and discriminates against them. It is clear that, if the statute does hinder or deny the exercise of these rights, then an appropriate decree by this court would redress the injury, thus satisfying the causation or redressability test of Warth v. Seldin ... and Winpisinger v. Watson ....
 
 
 122
 512 F.Supp. at 32.
 
 
 123
 The Bolger court found Winpisinger distinguishable principally because Common Cause challenged the franking statute's effect on the entire election campaign process, rather than simply asserting that the franking statute changed electoral outcomes. 512 F.Supp. at 30-32. The court reasoned:
 
 
 124
 This dispute over standing boils down to a dispute over the role of congressional elections in our political system. If the purpose of campaigns is only to elect candidates, then defendants' ... arguments concerning causation and resultant lack of standing might have some weight. Congressional campaigns, however, serve other purposes besides electing particular candidates to office. They are also used to educate the public, to advance unpopular ideas, and to protest the political order, even if the particular candidate has little hope of election. The First Amendment most certainly protects political advocacy of this type, and infringements of these rights can occur regardless of the success or failure of a particular candidate at the polls. Thus, the causation requirement is satisfied here, for the asserted harm, and its remedy, are not dependent upon electoral outcome, but on the existence of the franking statute and the conduct permitted under its aegis.
 
 
 125
 512 F.Supp. at 32;[13] see also Fulani v. League of Women Voters Educ. Fund, 882 F.2d 621, 626-27 (2d Cir.1989) (finding Bolger more applicable than Winpisinger in a candidate's challenge to her exclusion from primary debates).
 
 
 126
 It is this broader effect on congressional campaigns that distinguishes Bolger from the instant case. Although Appellants allege that the threat of a ten-fold utility rate increase influences the decisions of their fellow voters, they do not contend that this threatened rate increase has chilled political advocacy by supporters of the merger proposal.[14] The contract provisions in question here do not give merger opponents any sort of advantage in propagating their views to the voters. Appellants' allegations of diluted voting power, therefore, do not present the threat to political discourse that concerned the Bolger court.
 
 
 127
 Because Appellants assert only that the threatened ten-fold rate increase improperly influences the outcome of the merger election, we find that Winpisinger 's and Shakman 's causation analysis is more applicable here. Each voter's decision on the merger proposal potentially is influenced by a variety of factors, among which the threatened utility rate increase is but one.[15] Even if it were possible, we would be reluctant to probe the minds of the voters in an attempt to quantify the effects of these various factors. Moreover, we hesitate to state a quantum of electoral influence that would be sufficient to establish the causation element of standing. To do so would be to engage in precisely the sort of speculation that has proved fatal to Appellants' attempt to satisfy either the "injury in fact" or "causation" elements of standing.
 
 
 128
 Consequently, we hold that the speculative nature of the political forces at work in the merger election precludes Appellants from establishing a causal nexus between their alleged vote dilution injury and the challenged contract provisions. Because many factors potentially entered into each individual voter's decision whether to support or oppose merger, and because each voter likely weighed those factors differently, Appellants cannot show that the defeat of the merger proposal was attributable to the threat of ten-fold water and sewage rate increases. Even if we were to deduce from basic economic principles that the threatened rate increase probably had some influence on voters' decisions, we are unable to conclude that this influence was sufficient to alter the outcome of the merger election. Finally, we think it inappropriate for courts to undertake the detailed inquiry into the electoral process that would be necessary to establish the causation element of Appellants' claims.
 
 
 129
 It follows that the redressability element of standing also is lacking; were we to strike the provisions in question from the water and sewage contracts, we are unconvinced that the fate of the merger proposal would be different. Accordingly, Appellants have failed to establish any of the constitutional elements of standing. We therefore agree with Appellees that Appellants' complaint should be dismissed for lack of standing.[16]IV. CONCLUSION
 
 
 130
 For the foregoing reasons, we find that Appellants do not have standing to assert their claims. Because the district court reached the merits of those claims, we must vacate the portion of the district court's judgment that concerns Appellants' claims.[17] Moreover, because Appellants lack standing, we remand this matter to the district court with instructions that the claims of Appellants Bennett and Mango be dismissed.
 
 
 131
 BATCHELDER, Circuit Judge, concurring.
 
 
 132
 Because I cannot agree with the approach the majority takes to determining the issues in this appeal, or with some of its conclusions, I write separately. The district court granted summary judgment to the defendants on the merits of these claims, and plaintiffs appealed. Defendants-appellees have moved to dismiss the appeal for lack of jurisdiction. The majority opinion reviews the question of jurisdiction, accepting as true the facts pleaded by the plaintiffs and further accepting the plaintiffs' characterization of their claimed injury. I think the majority errs in doing so. As the majority correctly points out, ante at 1346, having invoked the jurisdiction of the federal courts, it is the plaintiffs' burden to demonstrate that jurisdiction is proper. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (citations omitted). This burden persists for every stage of the litigation, since the rule in federal cases is that an actual controversy must exist at all stages of review, and not merely at the time the complaint is filed. Steffel v. Thompson, 415 U.S. 452, 459 n. 10, 94 S.Ct. 1209, 1216 n. 10, 39 L.Ed.2d 505 (1974) (citations omitted). Additionally, since federal courts are courts of limited jurisdiction, they are bound to assure that in every case jurisdiction in the federal court is proper, and this is so regardless of whether jurisdiction is challenged by the parties. See FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 230-31, 110 S.Ct. 596, 607, 107 L.Ed.2d 603 (1990) ("Although neither side raises the issue here, we are required to address the issue even if the courts below have not passed on it, ... and even if the parties fail to raise the issue before us. The federal courts are under an independent obligation to examine their own jurisdiction, and standing 'is perhaps the most important of the jurisdictional doctrines.' " (brackets omitted) (citing Jenkins v. McKeithen, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848-49, 23 L.Ed.2d 404 (1969) and quoting Allen v. Wright, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984))). Therefore, for the reasons that follow, I think the district court should have raised the issue of jurisdiction sua sponte, and dismissed this case because the plaintiffs' complaint failed to allege facts presenting any case or controversy and demonstrating that plaintiffs had standing to bring the action. Finally, I would hold that plaintiffs have not shown and cannot show that there is now any case or controversy before this court, or that they have standing to pursue this appeal, because any claimed injury, if one ever existed, is at once moot and purely conjectural.
 
 I. CASE OR CONTROVERSY
 
 133
 The Constitution (article 3, § 2) limits the exercise of the judicial power to "cases" and "controversies." ... The Declaratory Judgment Act of 1934, in its limitation to "cases of actual controversy," manifestly has regard to the constitutional provision and is operative only in respect to controversies which are such in the constitutional sense....
 
 
 134
 A "controversy" in this sense must be one that is appropriate for judicial determination.... The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.
 
 
 135
 Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-41, 57 S.Ct. 461, 463-64, 81 L.Ed. 617 (1937) (citations omitted); see also Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959-60, 22 L.Ed.2d 113 (1969) (holding that in determining whether a "controversy" requisite to relief exists under the Declaratory Judgment Act at the time of a hearing, the question is whether the facts alleged, under the circumstances, show there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality (quoting Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941))).
 
 
 136
 In my view, the complaint in this action does not contain facts that demonstrate a case or controversy sufficient to invoke the jurisdiction of the federal courts under Article III of the Constitution or 28 U.S.C. § 2201, the Declaratory Judgment Act. It is apparent from the face of the complaint that at the time this action was filed, not only was there no merger proposal on the ballot for the ensuing election, there was not even such a proposal wending its way through the requisite statutory steps to reach the ballot. Thus, at the time plaintiffs filed their complaint, their claim that the offending contract provisions affected their First Amendment rights to free speech and association and their Fourteenth Amendment right to vote was purely hypothetical.
 
 II. STANDING IN THE DISTRICT COURT
 
 137
 It is equally clear that plaintiffs lacked standing to pursue this action. As the Supreme Court noted in Lujan, the "irreducible constitutional minimum" of standing requires that the plaintiff establish three elements: First, that the plaintiff has suffered an "injury in fact," i.e., an invasion of a legally-protected interest which is both (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; second, that there is a causal connection between the plaintiff's injury and the challenged conduct of the defendant; and third, that a favorable decision from the court is likely to redress the plaintiff's injury. 504 U.S. at 559-61, 112 S.Ct. at 2136 (citations omitted).[1]
 
 
 138
 Here, plaintiffs' complaint alleges that the offending contract provisions impair their First Amendment rights to freedom of association and political expression relative to a potential merger of the Village of New Albany with Plain Township, and their First and Fourteenth Amendment rights to vote on such a merger. However, it is patent, both from the face of the complaint and from the evidence presented relative to the cross-motions for summary judgment, that the plaintiffs' real claim is that the offending contract provisions hinder plaintiffs' prospects for obtaining low-cost Columbus water while also obtaining the merger of the village with the township. Plaintiffs did not allege in their complaint that they would be prevented from campaigning for a merger or voting on a merger proposal, should one reach the ballot. Rather, they complain that if such a proposal were to emerge from the statutory procedure required in order to place a merger proposal on the ballot, the Village might not support the proposal and the majority of the electorate might not vote for it because of the economic consequences of doing so. This concern does not satisfy plaintiffs' burden of establishing a concrete and particularized, actual or imminent invasion of a legally protected interest.[2] Indeed, it is difficult to imagine a better example of an abstract and hypothetical invasion of a claimed right than this "if we had some ham we could have a ham sandwich if we had some bread" claim.
 
 III. STANDING TO APPEAL
 
 139
 It is axiomatic that the "case or controversy" requirement must be met, not only at the inception of an action in federal court, but at all stages of the proceeding. Steffel, supra. Similarly, the plaintiffs must have standing to proceed at all stages of a federal action. See United States v. Van, 931 F.2d 384, 387 (6th Cir.1991). Here, the plaintiffs cannot demonstrate that any case or controversy continues to exist between themselves and the defendants, or that plaintiffs now have any legally protected interest that the defendants' conduct threatens to invade. It is undisputed that after the entry of judgment in favor of defendants, a merger proposal was in fact placed on the ballot and soundly defeated by the electorate. Under the Ohio statutory scheme governing mergers between municipalities and unincorporated townships, a merger of the Village of New Albany and Plain Township may not be proposed again for three years.[3] The plaintiffs did not and do not challenge the Ohio law. Furthermore, at no time prior to the election on the merger proposal did the plaintiffs attempt to enjoin the election pending resolution of their claims that the contract provisions were unconstitutional; indeed, it is undisputed that both plaintiffs voted in that election. Thus, plaintiffs cannot claim that the contract provisions present any imminent injury to their First or Fourteenth Amendment rights, and their claims as they relate to the completed election are moot.
 
 
 140
 Clearly, as was the case when this action was originally filed, the interests to which plaintiffs claim injury are their interests in obtaining a particular result in the election on the merger proposal and in obtaining Columbus water under terms other than those to which the Village of New Albany and the City of Columbus agreed. These interests are not legally-protected interests for purposes of demonstrating standing. Cf. Smith v. Winter, 717 F.2d 191, 198 (5th Cir.1983) ("[T]he right to an 'effective' vote refers to the citizen's right to make his voice heard in the electoral process, and not the ability to command results in public office. That is to say, a vote for a losing candidate is as 'effective' as a vote for a winning candidate, if voting opportunities are equal.").
 
 IV. MOTION TO DISMISS
 
 141
 Although the majority opinion reaches the conclusion that plaintiffs lack standing to bring this appeal, ante at 1355-56, in my view the majority seriously errs in holding that because the standing issue is before us on a motion to dismiss, we must "accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." Ante at 1346 (citing Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975)). Warth sets forth the standard for the district court's review of the facts on a motion to dismiss for want of standing, and for the appellate court's review of the disposition of that motion. However, the majority opinion fails to distinguish between a motion to dismiss for lack of standing filed in the district court, and a motion to dismiss the appeal for lack of standing. The latter is, of course, what is before us in this case. Additionally, the majority fails to credit what Warth goes on to say in regard to the portions of the record to be considered by a district court on a motion to dismiss for want of standing:
 
 
 142
 At the same time, it is within the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing. If, after this opportunity, the plaintiff's standing does not adequately appear from all materials of record, the complaint must be dismissed.
 
 
 143
 422 U.S. at 501-02, 95 S.Ct. at 2206-07.
 
 
 144
 The motion to dismiss this appeal must, I believe, be viewed in light of all of the materials of record. See FW/PBS, 493 U.S. at 231-38, 110 S.Ct. at 608-11 (vacating a judgment after sua sponte review of standing where an examination of the entire record, including affidavits filed in district court, revealed that no party had standing). I cannot concur in a holding that would require courts of appeal, when reviewing motions to dismiss appeals for lack of standing, to confine their review to only those facts contained in the complaint and to consider those facts as true.
 
 
 145
 Neither can I concur in the majority's apparent conclusion that in reviewing this motion to dismiss the appeal, we are required to accept the plaintiffs' characterization of the injury in fact on which plaintiffs premise their claim of standing. See ante at 1346, 1347-49. As the majority points out, plaintiffs' burden is to demonstrate that they have a "legally-protected interest" that was invaded by the actions of the defendants. Lujan, 504 U.S. at 560, 112 S.Ct. at 2136. While the existence of such an interest must be established by the facts, the nature of that interest is in my view, a question of law, see Sexton v. Barry, 233 F.2d 220, 223 (6th Cir.) (holding that in considering a motion to dismiss, the court does not accept pleader's conclusions as true) (citations omitted), cert. denied, 352 U.S. 870, 77 S.Ct. 94, 1 L.Ed.2d 76 (1956); Tesar v. Hallas, 738 F.Supp. 240, 241 (N.D.Ohio 1990) (citing Papasan v. Allain, 478 U.S. 265, 286, 106 S.Ct. 2932, 2944, 92 L.Ed.2d 209 (1986) (declining to accept, as true, legal conclusions couched as factual allegations in reviewing a dismissal under FED.R.CIV.P. 12(b)(6))); Morrow v. South, 540 F.Supp. 1104, 1108 (S.D.Ohio 1982) (citations omitted), and plaintiffs' attempt to characterize their injury as a vote-dilution claim does not define our review of federal-court jurisdiction or plaintiffs' standing to bring this action. See Murphy v. United States, 45 F.3d 520, 522 (1st Cir.) (holding that a plaintiff may not rely on unsupported conclusions or interpretations of law in responding to a motion to dismiss under FED.R.CIV.P. 12(b)(1) (citing Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir.1993))), cert. denied, --- U.S. ----, 115 S.Ct. 2581, 132 L.Ed.2d 831 (1995). Nothing in the complaint raises a claim that can reasonably be characterized as a vote-dilution claim, and plaintiffs' calling it one cannot make it so. The majority's review of the issue of standing in classic vote-dilution cases, ante at 1347-52, is simply irrelevant to the issue of standing in this case.
 
 V. CONCLUSION
 
 146
 Because there has never been a justiciable case or controversy presented by these plaintiffs, and because they did not initially and do not now have standing to pursue this action, I concur in the result but not in the reasoning of the majority opinion.
 
 
 
 *
 The Honorable Gerald E. Rosen, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 We will consider the proper characterization of Appellants' injury at greater length below, in our determination whether Appellants have standing to pursue their claim
 
 
 [2]
 The fact that this appeal was not heard until after the election is of little significance. Appellants did obtain a district court ruling, albeit unfavorable, prior to the election. Furthermore, once on appeal, Appellants sought, but were denied, expedited review by this Court
 
 
 [3]
 These factual issues were not explored before the district court, because the City did not assert lack of ripeness until Appellants filed this appeal
 
 
 [4]
 We readily agree with the proposition advanced in Judge Batchelder's concurrence that a court may, in some instances, consult the entire evidentiary record when deciding whether a plaintiff has standing to pursue a claim. However, as explained below, we find in this case not that Appellants have failed to adduce evidence in support of their theory of standing, nor that Appellants merely lack standing to pursue this appeal. Rather, we hold--and Judge Batchelder apparently agrees--that Appellants' pleadings fail to make out a justiciable "case" for want of standing, and we accordingly dismiss their claims--not just their appeal--and vacate the district court's judgment as having improperly reached the merits. We believe this broader result is foreclosed unless we confine our analysis to the four corners of Appellants' complaint
 
 
 [5]
 Our inquiry into the conjectural nature of Appellants' vote dilution claim necessarily overlaps our inquiry into the causal connection between Appellants' alleged injury and the City's conduct; both concern the extent to which the contract provisions might have affected the vote on the merger proposal. We treat this issue more thoroughly in our causation analysis
 
 
 [6]
 Indeed, although not at issue in this case, the City apparently has a First Amendment right to voice its opposition to the merger. See, e.g., Fischer Sand & Aggregate Co. v. City of Lakeville, 874 F.Supp. 957 (D.Minn.1994) (recognizing the defendant city's First Amendment right to petition government bodies in adjacent communities in opposition to the plaintiffs' proposed gravel mine)
 
 
 [7]
 Moreover, if the City somehow misrepresented the interests of its citizens by insisting upon the ten-fold rate increase provisions, the electoral process provides the appropriate remedy: the City's voters can elect new representatives. That remedy is likewise available to Village voters who believe that their elected officials failed to serve Village interests when they agreed to the water and sewage contracts
 
 
 [8]
 We, of course, express no opinion regarding the legality of the rate increase provisions under contract law
 
 
 [9]
 To the extent that Appellants are arguing that the ten-fold increase in no way represents a realistic assessment of merger's cost to the City, we believe that this assertion is better evaluated under state contract law principles than under constitutional principles
 
 
 [10]
 Appellants argue that this decision amounts to a determination of the substantive merit of their claims. The "injury in fact" element contributes nothing to our standing inquiry, however, unless we first consider the nature and scope of the right upon which Appellants rely. See William A. Fletcher, The Structure of Standing, 98 Yale L.J. 221, 229-39 (1988) ("The essence of a standing inquiry is thus the meaning of the specific statutory or constitutional provision upon which the plaintiff relies rather than a disembodied and abstract application of general principles of standing law."). To do otherwise would disregard our responsibility to determine whether Appellants' asserted injury is "too abstract, or otherwise not appropriate, to be considered judicially cognizable." Allen, 468 U.S. at 752, 104 S.Ct. at 3325
 
 
 [11]
 In light of this conclusion, we are puzzled by the suggestion in Judge Batchelder's concurrence that we have erroneously "accepted" Appellants' characterization of their injury. We believe we have "accepted" Appellants' characterization only in the sense that courts routinely "accept" legal propositions advanced by parties: namely, for the limited purpose of assessing the viability of such a proposition under the law. Like Judge Batchelder, we reject Appellants' contention that they have suffered a judicially cognizable "vote dilution" injury. However, because our survey of the case law indicates that Appellants have advanced a fairly novel view of "vote dilution," we have undertaken a review of classic vote-dilution cases, and have endeavored to show that Appellants' asserted injury differs from the injuries claimed in those cases in certain legally significant ways
 
 
 [12]
 The court noted that an organization such as Common Cause "stands in the shoes of its members in determining whether there is standing." 512 F.Supp. at 30
 
 
 [13]
 After protracted litigation, the District Court for the District of Columbia ultimately rejected the constitutional challenges to the franking statute. Common Cause v. Bolger, 574 F.Supp. 672 (D.D.C.1982), aff'd, 461 U.S. 911, 103 S.Ct. 1888, 77 L.Ed.2d 280 (1983). Before reaching the merits, the court once again addressed the plaintiffs' standing:
 We do not regard the issue of standing as a frivolous one and acknowledge that there may be a legitimate concern over whether plaintiffs' limited showings are sufficient to establish standing. We also recognize that the type and cause of injuries claimed in this case are not easily subjected to proof. Rather than to resolve the complexities of this issue, we prefer to confine our holding to plaintiffs' constitutional claims.
 
 
 [574]
 F.Supp. at 679 n. 11
 
 
 [14]
 Appellants hint at such a broader effect, alleging that the City warned various Village officials that any actions they took in support of merger could lead to termination of the water and sewage contracts. However, any such conduct by the City clearly is unrelated to the ten-fold rate increase provisions that are the subject of Appellants' challenge
 
 
 [15]
 In their brief in support of their first motion to dismiss, Appellees cite the following as reasons given by merger opponents to explain their opposition to merger:
 [T]he proposed merger would dilute police services at a time of public concern directed at crime from one officer to 200 citizens to one officer to 436 citizens; the Village prohibits the discharge of firearms within city limits and currently the township, which is located in a rural area, has hunting and other activities involving the discharge of firearms; the debts and obligations of the township being assumed by the Village; whether farm activities and livestock can continue to be maintained; the future maintenance of township roads; trash collection; the boundaries of school districts; annexation and development; taxes--property tax, existing tax in operating levies; the Village currently imposes an income tax and the township does not ...; police and fire service; the future of current township as well as Village employees; zoning; continued operation of a mayor's court; employee wages as well as potential layoffs; and the effective date, which may or may not occur dependent upon the existence of one or more of seven contingencies, which is very confusing to the voter.
 (Appellee Br. in Support of First Mot. to Dismiss at 9 n. 2.)
 
 
 [16]
 Because we find that Appellants lack standing to pursue their claims, we need not consider Appellees' second motion to dismiss. This second motion, filed after the November 1994 election, asserts that the election rendered Appellants' claims moot
 
 
 [17]
 However, because not all of the plaintiffs in the court below elected to appeal the judgment against them to this Court, we vacate the district court's judgment only with respect to the claims of Appellants Bennett and Mango
 
 
 [1]
 The majority recognizes the Lujan standard, e.g., ante at 1346, which "has tightened up the rules on standing...." Children's Healthcare is a Legal Duty, Inc. v. Deters, 92 F.3d 1412, 1420 (6th Cir.1996) (per Batchelder, J.)
 
 
 [2]
 Additionally, it is clear from the face of the complaint and the evidence in the summary-judgment proceedings, that plaintiffs cannot establish either the causation or redressability elements relative to this asserted injury. In Lujan, the Supreme Court points out that in suits challenging government action or inaction where plaintiff's asserted injury arises from government's allegedly unlawful regulation of someone else,
 causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction--and perhaps on the response of others as well. The existence of one or more of the essential elements of standing "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," and it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury. Thus, when the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily "substantially more difficult" to establish.
 504 U.S. at 562, 112 S.Ct. at 2137 (citations omitted).
 
 
 [3]
 Sections 709.43-709.48 of the Ohio Revised Code specify the procedure that must be followed before municipalities or unincorporated townships may be merged. See OHIO REV.CODE §§ 709.43-709.48 (Supp.1995). It is an exacting and slow process, see id., and, once a proposed merger has been disapproved by a majority of voters in an election, the same merger may not again be proposed for at least three years after the defeat. Id. § 709.47